211 N.J. Super. 121 (1986)
511 A.2d 139
THE NEWS PRINTING COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
BOROUGH OF TOTOWA, A MUNICIPAL CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division Passaic County.
Dated January 3, 1986.
*127 Alexander F. McGimpsey for plaintiff (McGimpsey & Cafferty, attorneys; Thomas J. Cafferty on the brief).
Robert S. Moraff for defendant (Fiorello, Moraff, Foster & Corrado, attorneys; W. Randall Bush on the brief).
DWYER, J.S.C.
After defendant, Borough of Totowa, a municipal corporation, ("Totowa"), placed a notice, printed on cardboard, on seven of the honor boxes or newsracks owned by plaintiff, The News Printing Company, a New Jersey corporation, ("News"), stating[1] *128 that the newsrack was placed in violation of ordinance no. 09-83, must be immediately moved, and upon failure to remove within 48 hours, the newsrack would be confiscated and a summons issued, counsel for the News, based on a verified complaint, supporting certification, brief and notice to Totowa, applied for a preliminary injunction to restrain Totowa from removing its newsracks and declaring said ordinance unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States and the Constitution of New Jersey.
Section seven of said ordinance provided that any person who shall be convicted of violating said ordinance shall be subject to a fine not exceeding $100. The other provisions of the ordinance shall be considered hereafter but none provided for confiscating "newsracks" for the owners violating the ordinance.
There was no basis in the ordinance upon which Totowa or its officials could base their act in giving notice or in taking any further action. Regulation of activities upon streets and sidewalks is normally by ordinance. 5 McQuillin, Municipal Corporations, §§ 15.03 and 15.04; N.J.S.A. 40:67-1. A municipality may also prescribe penalties for violation thereof under N.J.S.A. 40:49-5 by ordinance. In the absence of a municipality having adopted an ordinance authorizing activity proposed to be carried out, or being carried out, a municipal official has no *129 power to act. Cf. City of Paterson v. Barnet, 46 N.J.L. 62, 66 (Sup.Ct. 1884) (city denied writ of mandamus to compel mayor to sign city bonds to be sold to pay off sewers where board of aldermen had not adopted an ordinance authorizing construction of sewers).
The removal of the newsracks by either the News or Totowa would interfere with the circulation of newspapers to members of the public. This posed questions about the First Amendment which is applicable to the states and municipalities under the Fourteenth Amendment. Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 85 L.Ed. 949 (1938); Kash Enterprises Inc. v. City of Los Angeles, 19 Cal.3d 294, 138 Cal. Rptr. 53, 562 P.2d 1302 (Sup.Ct. 1977). (sections of municipal ordinance authorizing seizure of newsracks which were placed in violation of ordinance held unconstitutional).
First Amendment protections are applicable to the public distribution of newspapers and periodicals through newsracks.... [562 P.2d at 1306]
See Passaic Daily News v. City of Clifton, 200 N.J. Super. 468 (Law Div. 1985).
By the return date, the complaint which was filed in the Chancery Division was designated as an action in lieu of prerogative writs without objection by Totowa and assigned to this judge by the assignment judge.
The issuance of a preliminary injunction to stay enforcement of an ordinance in a prerogative writ action challenging a statute or ordinance is proper. Two Guys from Harrison, Inc. v. Furman, 59 N.J. Super. 135 (Law Div. 1959). But a preliminary injunction does not issue as of right but only upon a showing that: (1) plaintiff will suffer irreparable harm; (2) the underlying right sought to be enforced is free from doubt; (3) the material facts are not in dispute; and (4) the granting of the preliminary injunction will not inflict undue hardship on defendant but denying it will substantially hurt the plaintiff. See Crowe v. DeGioia, 90 N.J. 126, 133-134 (1982).
*130 The denial of the injunction would result in the removal of seven of the newsracks of the News in Totowa, if not all, with the result that the News' ability to circulate its papers and the public's right to obtain them under the First Amendment would have been infringed. In cases involving First Amendment rights, the burden is on the municipality to show that it has a substantial interest to protect and that the regulation is related to that interest and allows sufficient alternative means of communication. Where, as here, the News showed that the ordinance 09-83 provided a prior restraint in that a license was required before a newsrack could be placed, the burden was on Totowa to prove the constitutionality of that ordinance, Capitol Movies Inc. v. City of Passaic, 194 N.J. Super. 298, 302-303 (App.Div. 1984).
The material facts pertaining to the provisions in ordinance 09-83 and certain actions of the News in placing newsracks without a license were not in dispute. Further, where no action is pending under an ordinance with criminal sanctions against a person, but such action is threatened, such person may seek a declaratory judgment that the ordinance is unconstitutional rather than wait to defend a criminal charge. Philadelphia Newspapers Inc. v. Borough of Swarthmore, 381 F. Supp. 228 (E.D.Pa. 1974).
Those were the facts that were relevant in respect to the granting of the preliminary injunction. Finally, the certifications and related photographs indicated that there was little likelihood of finding a safety hazard and that there was no history of complaints about the newsracks being the subject of safety incidents or vandalism. Balancing the equities so as to preserve the status quo, the court issued a preliminary injunction restraining the enforcement of the ordinance.
Following discovery, counsel requested that the court delay a hearing until the decision in Passaic Daily News, supra, was rendered, and thereafter requested additional time to have their experts ready.
*131 The court will set forth certain background facts and then give its decision on the questions posed in the following order:
1. Validity of licensing requirement, §§ 2, 3 and 4.
2. Validity of maintenance and installation requirements, § 5.
3. Validity of location and placement of newsrack requirements, § 6.
4. Whether the separability clause should be used to save any provisions of the ordinance found to be valid.
The News editorial office and printing plant is in the City of Paterson. Currently, it publishes a morning newspaper six days a week.
Totowa is located on the west side of the City of Paterson and the east side of Wayne Township which also bounds Totowa on the south. The Passaic River is Totowa's eastern boundary. Route # 46 and Route # 80 cross Totowa.
The property along Route # 46 is zoned "thoroughfare business." Union Boulevard runs through the principal residential zones of Totowa. The properties adjoining it are zoned "community business."
The News has 11 newsracks in Totowa. Most are located either along Union Boulevard or Route # 46 on sidewalks or on properties in the zones mentioned above.
William Monahan ("Monahan") has been the circulation manager for the News for the past five years. He has worked for newspapers operating in the Bergen-Passaic area in the circulation departments for the last 33 years. He testified that the News delivers papers to the newsracks between 2:00 a.m. and 3:00 a.m. six days a week. The News has no Sunday edition. The News also delivers papers to nine stores in Totowa.
He stated that the News has young persons who deliver newspapers to homes. They are between the ages of 11 to 14. Under applicable state law, they cannot deliver newspapers before 6:00 a.m., except the 14-year-olds may deliver papers after 5:30 a.m.
He explained that the five newsracks located on Union Boulevard were placed there to serve commuters who board buses *132 along that street and for those who shop in that area. The locations are selected to be near restaurants and at intervals between stores which may sell copies of the News.
In respect to the newsracks located along Route # 46, the locations were picked to be near boarding points for commuter buses and entrances to restaurants.
He further testified that four of the present newsracks are located on private property. A fifth was located on private property but was removed at the owner's request.
He further stated that no newsracks were chained to fire call boxes or fire hydrants. The boxes are usually chained to some object. Where that is not possible, they are weighted down or bolted down.
In his opinion, the vending newsracks may not be profitable but the News has to have them so that the paper is read.
From some boxes only 10 to 15 papers are sold a day. In such areas, the News could not sustain a newsperson. From other newsracks, 50 papers a day are sold. He testified that the newsracks in question are 24" wide, 20" deep and 3' high.
Witnesses for Totowa urged that the subject ordinance is intended to be a reasonable "time, place, and manner" regulation of objects in the public area to avoid hazardous conditions and thereby promote safety and unimpeded flow of traffic in the street and on the sidewalks. They also urged that said ordinance promoted Totowa's aesthetics by avoiding visual clutter and sight pollution thereby improving its image.
The News sells only newspapers from its newsracks.

*133 1. Validity of Licensing Requirements, §§ 2, 3 and 4.
Ordinance 09-83 was adopted on December 20, 1983. The provisions of §§ 2, 3 and 4 are set forth below.[2] After the *134 adoption of that ordinance, the News placed five newsracks in Totowa in 1984. The News did not apply for a permit before or after placing those newsracks. It also placed four newsracks in 1978 and two in 1983.
The ordinance requires that a person seeking to lawfully place a newsrack along a street or on a sidewalk area in Totowa must fill out and sign a written application for a permit stating the location.
There are no standards setting forth the criteria under which the permit will be issued or denied by the mayor and council.
There is no time period within which the mayor and council must approve or deny. If the permit is denied, the person must then initiate judicial action to have the determination set aside. For such a person to proceed to place newsracks would be a violation of the ordinance.
In Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), Lovell's conviction of violating an ordinance prohibiting distribution of handbills, magazines, or literature of any kind without first obtaining a permit from the city manager by distributing handbills and magazines without having obtained a permit was reversed.
After pointing out that municipalities relying upon state laws authorizing them to adopt ordinances constitutes state action and hence such ordinances are subject to the prohibitions of the First and Fourteenth Amendments, id., 303 U.S. at 451, 58 S.Ct. at 669, 82 L.Ed. at 953, Chief Justice Hughes writing for *135 the Court held the ordinance invalid on its face because it violated said Amendments.
... Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his "Appeal for the Liberty of Unlicensed Printing." And the liberty of the press became initially a right to publish "without a license what formerly could be published only with one." While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. See Patterson v. Colorado, 205 U.S. 454, 462, 51 L.Ed. 879, 881, 27 S.Ct. 556 [558], 10 Ann.Cas. 689; Near v. Minnesota, 283 U.S. 697, 713-716, 75 L.Ed. 1357, 1366-1368, 51 S.Ct. 625 [630-631]; Grosjean v. American Press Co., 297 U.S. 233, 245, 246, 80 L.Ed. 660, 666, 667, 56 S.Ct. 444 [447].
....
The ordinance cannot be saved because it relates to distribution and not to publication. "Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." Ex parte Jackson [6 Otto 727, 733], 96 U.S. 727, 733, 24 L.Ed. 877, 879. The license tax in Grosjean v. American Press Co., 297 U.S. 233, 80 L.Ed. 660, 56 S.Ct. 444, supra, was held invalid because of its direct tendency to restrict circulation.
[Id., 303 U.S. at 451-452, 58 S.Ct. at 669, 82 L.Ed. at 953-954].
In Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (ordinance prohibiting parades or public assemblies on streets, in parks or public places unless, upon application three days in advance, director of public safety issues a permit after investigation of the circumstances and facts of application which permit he could deny to prevent riots, disturbances, or disorderly assemblies held invalid and injunction against officials enforcing it modified and affirmed) Justice Roberts rejected the contention of the petitioners that Davis v. Massachusetts, 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71 (1897) should control.
In the instant case the ordinance deals only with the exercise of the right of assembly for the purpose of communicating views entertained by speakers, and is not a general measure to promote the public convenience in the use of the streets or parks.
We have no occasion to determine whether, on the facts disclosed, the Davis Case was rightly decided, but we cannot agree that it rules the instant case. *136 Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.
... It enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent "riots, disturbances or disorderly assemblage." It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs for the prohibition of all speaking will undoubtedly "prevent" such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right. [307 U.S. at 515-516, 59 S.Ct. at 964, 83 L.Ed. at 1436-1437]
See Schneider v. State of New Jersey, (Town of Irvington), 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), in which the Supreme Court considered appeals concerning ordinances in several municipalities which prohibited distribution of printed matter on the sidewalks and some like Irvington's ordinance which required a person to obtain a permit in advance. All the ordinances were held invalid. Justice Roberts wrote for the majority. The Supreme Court held that if there is to be an infringement of First Amendment rights to prevent others from engaging in undesirable conduct that can be made unlawful and enforced by other means.
The motive of the legislation under attack in Numbers 13, 18 and 29 is held by the courts below to be the prevention of littering of the streets and, although the alleged offenders were not charged with themselves scattering paper in the streets, their convictions were sustained upon the theory that distribution by them encouraged or resulted in such littering. We are of the opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press. This constitutional protection does not deprive a city of all power to prevent street littering. Amongst these is the punishment of those who actually throw papers on the streets.

*137 It is argued that the circumstance that in the actual enforcement of the Milwaukee ordinance the distributor is arrested only if those who receive the literature throw it in the streets, renders it valid. But, even as thus construed, the ordinance cannot be enforced without unconstitutionally abridging the liberty of free speech. As we have pointed out, the public convenience in respect of cleanliness of the streets does not justify an exertion of the police power which invades the free communication of information and opinion secured by the Constitution.
....
Conceding that fraudulent appeals may be made in the name of charity and religion, we hold a municipality cannot, for this reason, require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be carried to the homes of citizens; some persons may, while others may not, disseminate information from house to house. Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.
We are not to be taken as holding that commercial soliciting and canvassing may not be subjected to such regulation as the ordinance requires. Nor do we hold that the town may not fix reasonable hours when canvassing may be done by persons having such objects as the petitioner. Doubtless there are other features of such activities which may be regulated in the public interest without prior licensing or other invasion of constitutional liberty. We do hold, however, that the petitioner's conduct, is void, and she cannot be punished for acting without a permit. [60 S.Ct. at 151-152]
In Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) the Supreme Court upheld petitioner's conviction for violating a municipal ordinance prohibiting a person from willfully making or assisting in the making of any noise or diversion in an area adjacent to a building in which a school or classes thereof are in session.
Justice Marshall writing for the majority stated that a municipal government may validly regulate activity in public areas.
Clearly, government has no power to restrict such activity because of its message. Our cases make equally clear, however, that reasonable "time, place and manner" regulations may be necessary to further significant governmental interests, and are permitted. For example, two parades cannot march on the same street simultaneously, and government may allow only one. Cox v. New Hampshire, 312 U.S. 569, 576, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). A demonstration or parade on a large street during rush hour might put an *138 intolerable burden on the essential flow of traffic, and for that reason could be prohibited. Cox v. Louisiana, 379 U.S. [536] at 554, 85 S.Ct. [453] at 464. [92 S.Ct. at 2303].
The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable." Although a silent vigil may not unduly interfere with a public library, Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest. Access to the "streets, sidewalks, parks and other similar public places ... for the purpose of exercising [First Amendment rights] cannot constitutionally be denied broadly ..." Free expression "must not, in the guise of regulation, be abridged or denied." [92 S.Ct. at 2303-2304]
In Miami Herald Publishing Co. v. City of Hallandale, 734 F.2d 666 (11 Cir.1984), the Circuit Court of Appeals affirmed that part of the judgment holding that licensing procedure that required newspapers to obtain a permit before placing or maintaining a newsrack along a street or on a public sidewalk area unconstitutional. The applicant had to submit a form to the city clerk who had to determine if the applicant and the proposed use were in compliance with city codes, and the applicant had to pay a flat license fee of $100 and an additional amount for each vending machine. If the city clerk found a probable violation, then he had to give notice and hearing before the city commission. If the city commission found no violation, then the license could issue. If the city commission found a violation and denied the license there was no specified procedure for judicial review.
The Circuit Court of Appeals held that under the ordinances the city's officials had broad discretion to determine what other codes applied and if there were violations. Further, there were no time limits on when the officials had to act.
The ordinance
... calls upon the city commission to adjudicate the rights of license applicants to receive business permits, to apply the specific facts surrounding a given applicant's case to the general body of law contained in the city code, to *139 determine if the applicant has violated a provision therein, and if so to deny him the right to do business. This is an adjudicative function, and as such necessarily involves the exercise of considerable discretion. Accompanying such discretion is the opportunity to discriminate against a licensee on the basis of what the licensee intends to say, which in the context of licensing newspaper distribution raises the spectre of prior restraint. International Society for Krishna Consciousness v. Rochford, 585 F.2d 263 (7th Cir.1978) (airport regulation authorizing airport official to issue permits to distribute literature only to those applicants "authorized by law to distribute literature," vested airport officials with untoward discretion discriminatorily to deny permits); Swearson v. Meyers, 455 F. Supp. 88, 91 (D.Kan. 1978), citing Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (a permit system must "leave no factors to be assessed, judgments to be made, or discretion to be exercised by the appropriate licensing official. In other words, the decision to grant or deny the license application must be virtually a ministerial one.").
In determining whether a state or municipal law that indirectly affects first amendment freedoms is narrowly tailored enough to pass constitutional muster, it is appropriate to consider whether alternative means are available to the state that would both serve the state's interest and exert a less severe impact on first amendment rights. L. Tribe, American Constitutional Law, 682-87 (1978). In this case, the municipality's interest in furthering the public health, safety and welfare by enforcing its ordinances can be and in fact is preserved by more narrowly tailored means. [734 F.2d at 675].
That court pointed out that there were more officers who had the responsibility to determine if other ordinances were being violated and they could enforce them. Therefore, there was no need to resort to a preregistration to enforce them; hence, there was an invalid prior restraint. The court also said:
No time limits are prescribed within which the city commission is to decide whether a given applicant must be denied a license for failure to comply with applicable provisions of the city code; during the indeterminate period that such a matter is pending, a newsrack operator is without a license to vend newspapers, and by the terms of Chapter 16, without a license, he may not operate the newsracks. Furthermore, the statute furnishes no means for judicial review, prompt or otherwise, of city commission decisions.
Because § 16-4.1 vests city officials with untoward discretion to deny licenses, and furnishes inadequate safeguards to ensure against abuse of that discretion, we hold that the section is unconstitutional on its face. [Id. at 675-676].
In Gannett Co. v. City of Rochester, 69 Misc.2d 619, 330 N.Y.S.2d 648 (Sup.Ct. 1972), the court held unconstitutional that portion of a municipal ordinance which regulated newsracks and vending machines for newspapers and magazines by requiring *140 a person intending to place such along the street or on the public area to apply ten days in advance, or within ten days after the adoption of the ordinance for a permit to the commissioner of public works who had discretion to determine if the unit would harmonize with the area, obstruct traffic, or be a hazard to the public.
This ordinance anticipates far too much. Instead of saying the sidewalk may not be obstructed it says one must apply for a permit even if there is no obstruction and then the decision will be made as to whether or not to grant one. This is inherently bad. The right to communicate thoughts and discuss questions on the public street may not be denied or even abridged by ordinance and certainly not in advance by requiring a permit upon the theory that its exercise may obstruct traffic. A municipality cannot require those who wish to discuss matters in the public street to present their subject first to the municipal authorities for approval with discretion in them to grant or refuse a permit. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. [Id. 330 N.Y.S.2d at 656]
In Philadelphia News Inc. v. Borough of Swathmore, supra, upon defendant's seizing and removing from a sidewalk location two newsracks owned by plaintiff on the ground that the newsracks violated defendant's ordinance limiting use of sidewalks for commercial uses to the owners, tenants, or occupants of stores adjoining sidewalks, plaintiff filed suit challenging the ordinance on the ground that the ordinance violated its rights under the First and Fourteenth Amendments. The court granted a preliminary injunction ordering return of the newsracks and subsequently declared the ordinance invalid.
While we are sensitive to the commendable goals of the residents of the Borough to control what may be perceived as a pervasive commercialism in our cities that is rapidly encroaching upon pleasant and well-ordered suburban communities such as the Borough of Swarthmore, we cannot agree with the contention that a newspaper loses the protection of the First and Fourteenth Amendments merely because it is operated for profit, or forms part of a profit-making enterprise. Such a contention was considered and rejected by the Court in Wulp v. Corcoran, 454 F.2d 826 (1st Cir.1972), a decision which invalidated an ordinance of the City of Cambridge, Massachusetts, establishing a licensing requirement for newspaper vendors on the city streets:
"it can no longer be seriously contended that the mere fact that newspapers such as those which plaintiffs wish to distribute are offered for sale rather than distributed free of charge dilutes the protection otherwise afforded by the First Amendment. Whatever room for doubt there may once have been on this score was removed by Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 *141 (1959). The Court in that case stated with respect to the First Amendment rights of a bookseller charged with violation of a state obscenity statute that `[i]t is of course no matter that the dissemination takes place under commercial auspices.' Id. at 150, 80 S.Ct. at 217." [Id. at 239-240]
After careful consideration of the legitimate interests of all parties in the instant litigation, we must agree with the courts in Gannett and Remer, supra, that newspaper vending boxes or machines along public streets and sidewalks are a constitutionally protected means of distribution, and we conclude that the Ordinance of the Borough of Swarthmore is constitutionally defective and therefore void, insofar as it is applied to condition the placement of newspaper boxes on public sidewalk strips within the Borough upon compliance with the totally uncertain and unsatisfactory provisions of the ordinance as modified by the resolution.
The Supreme Court has long recognized the importance of the right of access to the public streets for free dissemination of information. Many subsequent decisions have quoted the words of Mr. Justice Roberts in Hague v. C.I.O., 307 U.S. 496, 515-516, 59 S.Ct. 954 [963-964], 93 L.Ed. 1423 (1939) ... [see quotation at 135-136, supra]
The right of access to the streets included not only the right to speak freely, but the related right to distribute printed material. Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); Schneider v. State, 308 U.S. 147, 60 S.Ct. 416, 84 L.Ed. 155 (1939). It also includes techniques of dissemination which were unknown to the drafters of the Bill of Rights, when such techniques are shown to be important means of public communication; Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (municipality cannot require police permission before permitting use of sound trucks within city).
... In particular, the attempted regulation must be closely scrutinized to determine if the feared evil which was the object of the enactment could be attacked by a more narrowly drawn provision, which would less severely restrict freedom of expression and at the same time accommodate the proper interest of the municipality in promoting the welfare of its citizens. These are not easy problems to resolve. The Borough argues with much force and is supported by sincere citizens who testified in court about their apprehensions in opening the floodgates to commercialism and thus changing the character of the community in which they have justifiable pride. That is indeed a commendable concern. But against the desire to keep public sidewalks free of these boxes must be balanced not only the right of the plaintiff to distribute its newspapers, but the right of the public to have access that is as free as possible as long as the means of distribution do not create real hazards for the well-being of the citizens of the Borough in contrast to those hazards which are hypothesized, albeit, earnestly and sincerely feared. As the Court noted in Saia v. New York, supra, 334 U.S. at 562, 68 S.Ct. at 1150:
The present ordinance would be a dangerous weapon if it were allowed to get a hold on our public life. Noise can be regulated by regulating decibels. The hours and place of public discussion can be controlled. But to allow the police to bar the use of loud-speakers because their use can be abused is like *142 barring radio receivers because they too make a noise. The police need not be given the power to deny a man the use of his radio in order to protect a neighbor against sleepless nights. The same is true here.
Any abuses which loud-speakers create can be controlled by narrowly drawn statutes. [Id. at 241-243]
....
As noted, it is clearly unreasonable to say that the right to have the box displayed must depend upon the discretion of the merchant and, at that, only a merchant who sells newspapers from his own establishment as part of his regular business. Similarly, to say that even this mode of distribution must be limited to the business district, admittedly a small area within the Borough, and during only those hours when the particular store is open for business, would completely negate the underlying economic and factual basis of plaintiff's utilization of this type of newspaper distribution. Clearly, plaintiff is employing this means of distribution because changing conditions, circumstances and patterns of population among other reasons dictate changing modes of circulation. [Id. at 243-244]
Ordinance 09-83 applies only to newspapers. It is not an attempt to regulate all vending machines or other devises such as vending machines for milk, ice, telephone booths, etc., located in public areas. Totowa has adopted an ordinance chapter 157 of its code which incorporates the provisions of the Food and Beverage Vending Machine Code of 1961. It is administered by the board of health.
Ordinance 09-83 requires the issuance of a permit before a newsrack may be placed. Thus, its effect is to create a prior restraint on the distribution or circulation of newspapers.
There are no standards that control the discretion of the mayor and council in granting or denying a permit.
There is no time period within which they must act.
The court concludes that the ordinance is an invalid prior restraint under the First and Fourteenth Amendments.
Throughout the decisions of the United States Supreme Court, ordinances which are directed at conduct which endangers public health, safety, and property are sustained. Grayned v. City of Rochford, supra. But those which give unfettered power to officials to grant or deny permits in advance to those who will communicate ideas are struck down. *143 Lovell v. City of Griffin, supra; Hague v. C.I.O., supra; Schneider v. State, supra; and, Miami Herald Publishing Co. v. City of Hallandale, supra.
Section 4 requires the payment of a $10 fee for each newsrack referred to in the application. Presumably, each time a person proposes to install a new newsrack a new application would have to be filed and a new fee would have to be paid.
Further there is a requirement that the person agree to hold Totowa harmless and defend it against claims for personal injury and/or property damage arising from "the issuance of the permit or the control, maintenance, or ownership of the newsrack permitted." Such person must also agree to indemnify Totowa against such claims. Such person must also post an insurance policy in the face amount of $1,000,000 for personal injury and $50,000 for property damages.
A municipality's power to license or regulate businesses and activities within its boundaries as well as to exact fees for such licenses is dependent upon and limited by the Legislature's grant of such power. Gilbert v. Town of Irvington, 20 N.J. 432, 435 (1956).
Since the ordinance in question was adopted in December 1983, the provisions of N.J.S.A. 40:52-1 found in N.J.S.A. 40:48-40:55, 1986 Supplementary Pamphlet at 122-123 (L. 1968, c. 296) are the source of Totowa's authority. In relevant part said statute provides:
The governing body may make, amend, repeal and enforce ordinances to license and regulate:
g. Lumber and coal yards, stores for the sale of meats, groceries, and provisions, dry goods and merchandise, and goods and chattels of every kind, and all other kinds of business conducted in the municipality other than therein mentioned, and the places and premises in or at which the business is conducted or carried on; street stands for the sale or distribution of newspapers, magazines, periodicals, books, and goods and merchandise or other articles;
Subparagraph (b) of that statute permits municipalities to license and regulate autobuses and in relevant part states "... this section shall not be construed as modifying or repealing any of the provisions of chapter 4 (§ 48:4-1 et seq.) or article 3 *144 of chapter 16 (§ 48:16-23 et seq.) of the Title Public Utilities." Although the Legislature required the operators of autobuses to obtain the consent of municipalities and that such consent could require insurance coverage, the Legislature fixed the amount. The Legislature fixed the dollar limits at $10,000 per person and $100,000 per accident, and $5,000 property damages, for autobuses with less than 20 passengers.
The only other reference to insurance is found in subsection six authorizing regulations of auctioneers and authorizing a municipality to require an auctioneer to post a bond in a penal sum not to exceed $5,000.
During the trial of this matter, the credible testimony establishes that the News has maintained newsracks since 1978. The News keeps track of complaints and has facilities for the repair of its boxes. Based on the credible testimony, it has received no complaints of personal injury or property damage.
In Gannett & Co. v. City of Rochester, supra, the court observed that based on 20 years experience of operating newsracks Gannett had no complaints for personal injuries or property damage. The City of Rochester had received none.
At trial, Totowa offered no evidence that it had knowledge of any person sustaining personal injury, or property damage, as a result of the newsracks of the News or any other newspaper, the newsracks of which appear in the photographs in evidence, being in Totowa.
Assuming arguendo that Totowa has the necessary power to require the provision of insurance, § 4(e) fixes the amount for personal injury at $1,000,000 per person for personal injury and $50,000 for property damages, and the same amounts for more than one person in one accident.
Under the public utilities sections, the Legislature has provided as an alternative to providing an insurance policy a person may demonstrate financial capability to self-insure. This alternative is lacking under the ordinance.
*145 Totowa has not introduced any evidence nor cited any authority to show the basis upon which it would be liable, or the applicability or nonapplicability of the Tort Claims Act, N.J.S.A. 59:1-1 et seq., if a person sustained personal injury, or property damage, if a newsrack were placed and maintained as required by §§ 5 and 6 of the aforesaid ordinance
Totowa has not introduced any evidence to show the reasonableness of the per person limits, nor the property damage limits, of said insurance as they relate to a stationary object such as a newsrack. Under its ordinance for dance halls, chapter 62 of its code has limits of $25,000 per person or $50,000 for two or more persons. Totowa urges simply that the News did obtain a certificate of insurance under a larger policy that appears to cover the personal injury requirements of § 4(e). There is nothing to indicate that such certificate covers property damage. Totowa urges therefore that this requirement cannot be unreasonable.
In response to the reasonableness of the fee of $10 per machine, Totowa neither introduced any evidence as to the cost of processing the application initially, or on a renewal basis, nor did it introduce any evidence as to who would do the inspection and enforcement work. Totowa urges that the court should take judicial notice of wage rates and what it takes in manpower to process applications and inspect the boxes.
The insurance costs and the fees must be paid in order that the News obtain the permit to exercise its constitutionally protected right to disseminate or circulate newspapers, hence, they are part of a prior restraint. Under the case cited, supra, the burden of proof is upon Totowa to justify the reasonableness of the ordinance's requirements.
Taxes, or fees, levied specifically upon newspapers, as distinguished from taxes levied upon business entities generally, which include newspapers, have been looked upon with disfavor.
*146 In Absecon v. Vettese, 13 N.J. 581 (1953), the Supreme Court held that under N.J.S.A. 40:52-1(g) a municipality had not been given any power to impose license fees upon the publishing of a newspaper within its boundaries. It set aside the conviction of defendant for violating Absecon's ordinance imposing an annual fee of $50 per year for publishing a newspaper without obtaining a permit.
Justice Jacobs writing for the court said in part:
The constitutional issues presented by the imposition of licensing and taxing requirements on the publication of newspapers have been extensively considered in the cases. [Citations omitted]. In the Grosjean case [297 U.S. 233, 56 S.Ct. 449], the court dealt with an infamous attempt to control Louisiana newspapers by the imposition of a gross receipts license, tax on newspapers having a circulation of more than 20,000 copies per week. The court struck it down stating that although newspapers were not immune from ordinary forms of taxation, this was "not an ordinary form of tax, but one single in kind, with a long history of hostile misuses against the freedom of the press." The court's solicitude was well grounded. The free press is a bulwark of our democratic way of life and courts must be ever vigilant to curb insitious as well as candid attempts to restrict its vital public functions. However, where there is no malevolent attempt and the governmental requirement is being fairly applied to all, including newspaper publishers, courts find no impairment of the constitutional guaranty of freedom of press. See Mabee v. White Plains Pub. Co., 327 U.S. 178, 184, 66 S.Ct. 511, 514, 90 L.Ed. 607, 613 (1946), where the court noted that since "the press has business aspects it has no special immunity from laws applicable to business in general." [Id. 13 N.J. at 585-586]
The only relevant language in N.J.S.A. 40:52-1(g) is:
... street stands for the sale or distribution of newspapers, magazines, periodicals, books, and goods and merchandise or other articles.
Neither counsel nor the court have found any decision by the New Jersey courts construing that section or defining "street stands." If that language is construed so as not to include newsracks, then that is the end of the matter for unless the Legislature has expressly authorized regulation, a municipality has no power to regulate it or to tax it. Solomon v. Jersey City, 12 N.J. 379 (1953).
To hold that the Legislature authorized municipalities to regulate, under the police power, the time, manner and placement of stands for the sale of newspapers required to carry out some substantial interest of the regulating municipality is consistent *147 with the decisions of the United States Supreme Court that such regulations do not impair rights guaranteed by the First and Fourteenth Amendments. See Grayned v. City of Rockford, supra; Kash Enterprises v. City of Los Angeles, supra.
Although N.J.S.A. 40:52-2 authorizes a municipality to "fix the fees for all such licenses, which may be imposed for revenue," the New Jersey Supreme Court has construed that language to mean that the municipality must specify the activities being regulated, and may not impose a fee greater than the costs of implementing the regulations and processing the applications with only incidental excess for revenue, Gilbert v. Town of Irvington, supra, except where the regulated activity has a substantial impact, Nelson Cooney & Sons, Inc. v. Township of South Harrison, 57 N.J. 384 (1971).
This court concludes that newsracks are included within the concept of a "street stand" as used in N.J.S.A. 40:52-1. Webster's New International Dictionary (2 ed. 1959) contains no definition for "street stand." But it lists meanings for "street" as an adjective, "occurring or to be found in city streets."
"Stand" as a noun is defined as
a stall or booth for business; more broadly, any location or station for business, or considered as to its fitness for business opportunity; as a cigar stand; a news stand; a bus stand ...
This court concludes that the Legislature intended to allow municipalities to license those who would occupy small segments of the public easements associated with streets to have locations for the sale of newspapers.
Historically they have been small sheds with a large opening facing the sidewalk upon which pedestrians traveled and through which one paid for a newspaper. Others consisted of nothing more than a table or planks supported by saw horses from which newspapers were sold, usually in the evening, to commuters headed for a railroad station.
*148 The record in this case shows that most of the newspapers which have newsracks that appear in the photographs are morning newspapers, i.e., the Star Ledger, the New York Times, the Wall Street Journal, and the News. The newsracks are located where the commuters board buses. Although mechanical devices, they serve the same function of getting newspapers to those who travel and have time to read.
Counsel for the News urges that singling out newsracks which sell only newspapers for licensing and requiring the payment of fees and posting of excessive insurance coverage means that Totowa is imposing the equivalent of a special tax on newspapers contrary to the holding in Minneapolis Star v. Minnesota Comm. of Revenue, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).
In Minneapolis Star plaintiff-newspaper appealed from a judgment denying repayment of use taxes imposed on the value of ink and paper consumed in the publication of newspapers in excess of $100,000. Plaintiff urged that the tax was a special one imposed on it and a certain few other newspapers for the privilege of exercising its rights to print and circulate a newspaper guaranteed to it by the First and Fourteenth Amendments.
Minnesota had a 4% general sales tax from which newspapers were exempt. Minnesota supplemented that with a use tax to prevent individuals from buying goods in other states and bringing the goods back to Minnesota to use. The supplemental use tax was at the rate of 4% and was not applied to newspapers purchased outside the state.
Minnesota urged that at the 4% rate, the tax was less of a burden on newspapers than a sales tax at the same rate. The latter would have been imposed at the full retail price of the paper and in fact would have been about three times as much in dollars.
Because all but 14 newspapers were exempt from the tax and the use tax did not complement the general sales tax, the majority held that it was a special tax. The majority hinted *149 that Minnesota might have lawfully imposed the general sales tax if revenue was that state's concern.
The majority did not question the motive of the Minnesota legislature in passing the tax.
... Minnesota has singled out the press for special treatment. We then must determine whether the First Amendment permits such special taxation. A tax burden rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest. See, e.g., United States v. Lee, 455 U.S. 252, 71 L.Ed.2d 127, 102 S.Ct. 1051 (1982). Any tax that the press must pay, of course, imposes some "burden." But, as we have observed, see supra, at 581, 75 L.Ed.2d, at 302 [103 S.Ct. at 1369], this Court has long upheld economic regulation of the press. The cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses, e.g. Oklahoma Press Publishing Co. v. Walling, supra [327 U.S. 186], at 194, 90 L.Ed. 614, 66 S.Ct. 494 [498]; Mabee v. White Plains Publishing Co., supra [327 U.S. 178], at 184, 90 L.Ed. 607, 66 S.Ct. 511 [514]; Associated Press v. NLRB, supra [301 U.S. 103], at 132-133, 81 L.Ed. 953, 57 S.Ct. 650, [655-656], suggesting that a regulation that singled out the press might place a heavier burden of justification on the State, and we now conclude that the special problems created by differential treatment do indeed impose such a burden. [460 U.S. at 582, 103 S.Ct. at 1370, 75 L.Ed.2d at 303]
... A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. See Railway Express Agency, Inc. v. New York, 336 U.S. 106, 112, 113, 93 L.Ed. 533, 69 S.Ct. 463 [466, 467] (1949) (Jackson J., concurring). When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes become acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government. See, generally Stewart "Or of the Press," 26 Hastings LJ 631, 634 (1975). "[A]n untrammeled press [is] a vital source of public information," Grosjean, 297 U.S. [233] at 250, 80 L.Ed. 660, 56 S.Ct. 444 [449], and an informed public is the essence of working democracy.
Further differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional. [Citations omitted.] Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest *150 of compelling importance that it cannot achieve without differential taxation. [460 U.S. at 585, 103 S.Ct. at 1371-1372, 75 L.Ed.2d at 304-305]
....
One reason for this reluctance is that the very selection of the press for special treatment threatens the press not only with the current differential treatment, but with the possibility of subsequent differentially more burden-some treatment. Thus, even without actually imposing an extra burden on the press, the government might be able to achieve censorial effects, for "[t]he threat of sanctions may deter [the] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." NAACP v. Button, 371 U.S. 415, 433 [9 L.Ed.2d 405, 83 S.Ct. 328, 338]. [460 U.S. at 588, 103 S.Ct. at 1373, 75 L.Ed.2d at 307]
....
We have long recognized that even regulations aimed at proper governmental concerns may restrict unduly the exercise of rights protected by the First Amendment. E.g., Schneider v. State, 308 U.S. 147, 84 L.Ed. 155, 60 S.Ct. 146 (1939). A tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action. Since Minnesota has offered no satisfactory justification for its tax on the use of ink and paper, the tax violates the First Amendment, and the judgment below is reversed. [460 U.S. at 592, 103 S.Ct. at 1376, 75 L.Ed. at 309]
Where a newspaper demonstrates, as the News has, that a local ordinance singles out newspapers for special treatment, then such governmental unit has the burden of showing the justification for it under Minneapolis Star, supra.
Totowa urges that the object of ordinance 09-83 is regulation for public safety, traffic flow and aesthetics for public benefit with only modest fees to defray the costs of processing the application and enforcement.
As noted before, Totowa submitted no cost data in support of its contention that the fees cover the cost of administration and inspection. The impact of the fees and costs of excessive insurance are on those exercising or attempting to exercise rights protected by the First and Fourteenth Amendments before those rights may be lawfully asserted. Under such circumstances, Totowa has the burden of persuasion as to the validity of the regulation because it is the one imposing the restraint. See Capitol Movies v. City of Passaic, supra, and cases cited therein.
*151 In order to support the reasonableness of a license fee under N.J.S.A. 40:52-1 and -2, a municipality submits evidence of the cost of processing a license, the cost of enforcing the ordinance, and where there are special impacts upon it, what those costs are. See Automatic Merchandising Council of New Jersey, et al. v. Township of Edison, 204 N.J. Super. 395 (App.Div. 1985); Taxi's Inc. v. Borough of East Rutherford, 149 N.J. Super. 294 (Law Div. 1977), aff'd 164 N.J. Super. 160 (App.Div. 1978).
The fee for one machine is $10 for the initial permit and for each renewal thereafter. Presumably that fee was set high enough to process the application and issue the permit. Except for the location of an additional machine, or machines, the application would be the same.
Once a newsrack's location had been inspected to check its compliance with regulatory provisions, the only other inspections would be to check its compliance with the maintenance provisions.
In respect to maintenance, from the credible testimony, it appears that an employee of the News checks a newsrack six days a week when making deliveries. In addition, a separate employee checks each newsrack once a week when collecting the money. In addition, there is a telephone number on each newsrack and in the telephone directory to which anyone who has a problem may place a call.
Ordinance 09-83 specifies that the application is to be submitted to the borough clerk. It further states that the mayor and council shall approve it. Said ordinance does not specify who is to enforce it. The borough official who posted the notices on the newsracks at issue was the construction code official. The court concludes that Totowa planned no increase in existing personnel to either process the applications or to enforce the ordinance.
The fee structure is not broken down so that the work related to processing the paper work is reflected in one charge and then a fixed charge per unit for each additional unit is imposed. *152 See Silco Automatic Vending Co. v. Puma, 108 N.J. Super. 427 (App.Div. 1970). This procedure is followed under the ordinance regulating vending machines, a permit fee for the application and a license fee per machine.
Based on the record in this case, the court cannot make detailed findings as was done by Judge Skillman in Automatic Merchandising Council of New Jersey, supra, but notes that Judge Skillman found the reasonable dollar amounts for inspection per machine was $6.93 where the inspection was by the health department. The court infers that the machines dispensed food and hence had to be inspected more than once a year.
The court does not have testimony that any individual did not apply for a license because he, she, or it could not obtain insurance with the coverage required or could not afford it. In Gannett v. City of Rochester, supra, 330 N.Y.S.2d at 654, there was testimony to that effect.
For purposes of regulation, Totowa's expert on planning conceded that an application in advance of placement of a newsrack is not needed. A simple notification that would reach an appropriate official would be sufficient if the appropriate standards were in place to guide those placing newsracks.
This court agrees that Totowa has a right to enact reasonable regulations concerning the placement of newsracks as set forth hereafter and, in connection therewith, may charge a reasonable fee to defray the costs of administration and inspection. But the court concludes on this record that Totowa has failed to demonstrate that the amount of its fee is reasonable. The court concludes that the demand for insurance in the amounts required in ordinance 09-83 is unreasonable. The court concludes on this record that the fees and the insurance coverage create unreasonable financial burdens which deny the rights guaranteed by the First and Fourteenth Amendments and create prior restraints. The requirements are particularly suspect in that they apply only to newspapers. Minneapolis *153 Star v. Minnesota Commissioner of Revenue, supra; Absecon v. Vettese, supra. The court concludes that they are invalid.

2. Validity of Maintenance and Installment Requirements, § 5.

The provisions of this section are set forth below.[3]
*154 Monahan testified that based on his experience, he found that from an operational standpoint there would be no problems posed by paragraphs a to e of § 5. He did not express any opinion as to paragraph f.
In respect to f, Totowa urges that that section does not regulate the sale of obscene matter but only the manner in which it is displayed.
Totowa urges that Egg Harbor v. Colasuonno, 182 N.J. Super. 110 (Ch.Div. 1981) is not controlling. It urges that N.J.S.A. 2C:34-2(b) permits Totowa to regulate the sale of obscene matter.
Counsel for the News urges that the regulation of obscenity has been preempted by the provisions of N.J.S.A. 2C:34-2 et seq.
*155 The court concludes that N.J.S.A. 2C:34-2(b), which states in relevant part:
Nothing contained herein shall be construed to prohibit a municipality from adopting as a part of its zoning ordinance an ordinance permitting the sale of obscene material, in which event such sale shall be deemed legal,
affords no authority for the municipal action reflected in subparagraph (f).
Ordinance 09-83 neither recites that it is amending or supplementing any provision of the zoning ordinance nor by its terms purports to authorize uses or activities governed by the zoning ordinances.
As heretofore noted ordinance 09-83 is based on the authority granted to Totowa under N.J.S.A. 40:52-1 and -2.
This court concludes that the definition of obscenity is in conflict with the standards set forth in N.J.S.A. 2C:34-2. In State v. Hudson County News Co., 41 N.J. 247 (1963), Justice Proctor held that the standards of a particular community could not be used to gauge whether or not printed or pictorial matter was or was not obscene but suggested that the gauge had to be either statewide or national at least for the purposes of the First and Fourteenth Amendments.
Further as ordinance 09-83 is written, it lacks the safeguards required under the "due process of law" requirements for a determination of what is obscene and hence, if not otherwise valid, it is invalid as a prior restraint for the reasons expressed in State v. Hudson County News Co., supra.
The court concludes that the State in the area of printed matter has preempted the field for the reasons expressed by Judge Gibson in Egg Harbor v. Colasuonno, supra.
The court concludes that § 5(a) to (e) is valid and that § 5(f) is invalid.

*156 3. Validity of Requirements for Location of, and Placement of, Newsracks, § 6.

Totowa urges that its regulations are based on its interest in the safety of persons using the streets, the public easements associated with sidewalks, and aesthetics and is a valid exercise of its police power, N.J.S.A. 40:48 et seq., N.J.S.A. 40:67-1 et seq., and licensing power, N.J.S.A. 40:52-1 et seq. to reasonably regulate the manner and placement of newsracks.[4] Totowa *157 urges that it has not banned newsracks from its streets but has recognized the First Amendment and Fourteenth Amendment rights of newspapers to circulate their papers and only limit the manner and place where those rights are to be asserted in a way that is consistent with its substantial governmental interest. Members of City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (ordinance prohibiting posting of handbills or signs or otherwise marking public property or utility poles was constitutional and could be applied to those who posted signs in support of a candidate on cross arms of public utility poles); Kash Enterprises Inc. v. City of Los Angeles, supra, (ordinance regulating placement of newsracks was valid as to those provisions regulating placement but invalid as to enforcement provisions which authorized seizure without prior notice and hearing).
Counsel for News urges that, in part, ordinance 09-83 should be construed to be limited to public areas and not to newsracks located on private property such as shopping malls. Counsel further urges that § 6(e)8 is invalid as an improper delegation of municipality authority to churches, storeowners, and nonprofit schools by allowing those in charge to waive the ban against placement of newsracks within 200 feet of the location of their operations. Counsel has not attacked the ordinance on *158 a facial basis alone but has produced testimony of experts on traffic and planning to show that the criteria are not realistic or related to the municipality's needs, or interests, but constitute an attack on newsracks as opposed to all other objects that are in the public area.
The recitals stated in ordinance 09-83 all refer to conditions in "public sidewalks." In § 1, definitions, sidewalk and street are defined as follows:
(i) Sidewalk means an surface provided for the exclusive use of pedestrians.
(j) Street means all that area dedicated to public use for public street purposes and shall include but may not be limited to roadways, parkways, alleys and sidewalks.
Totowa has power to regulate streets and sidewalks and the public easements therein under N.J.S.A. 40:67-1 et seq. Kirzenbaum v. Paulus, 57 N.J. Super. 80 (App.Div. 1959) (municipality may authorize bank owning title to land to construct on sidewalk a "curbside teller" to serve those in automobiles); cf. Starego v. Soboloski, 21 N.J. Super. 389 (App.Div. 1952), aff'd 11 N.J. 29 (1952) (municipality may grant to third parties right to place objects such as watermains in the public easement so long as the public is not blocked and the right of the abutting owner are not interfered with).
Based on the definition of street with its emphasis on the "area dedicated to public use for public street purposes" and the language in the recitals, the court concludes that ordinance 09-83 is not applicable to newsracks placed on private property, which is not subject to an easement for the public use, such as the area of a shopping mall beyond the public easement of the streets or highways which it abuts.
In respect to subsection 6(e)8, the text of which is in footnote 4, the traffic engineer for Totowa stated that the purpose of this provision was to reduce traffic in those areas. But that reasoning would also apply to stores that sell newspapers. The driver of a car who sought a newspaper would stop near a store which sold newspapers and would also stop near a newsrack vending newspapers for the same reason, to buy a newspaper.
*159 Under the literal language of the ordinance, a store that sold only selected newspapers could block the publisher of any newspaper which it did not carry from placing a newsrack within 200 feet of the store. Thereby the owners of stores along a street such as Union Boulevard where most of the newsracks in question are located could significantly curtail the public's access to newspapers which they did not sell. Justice Hall in Nelson Cooney & Sons v. Township of South Harrison, 57 N.J. 384 (1971), in analyzing the line of cases which have held that ordinances imposing certain license fees were invalid on the ground that they were excessive, said:
In most of the cases the ordinances had few, if any, regulatory features and the cost of enforcement or of any regulation was minimal. The rationale of the decisions striking license fees as too oppressive may often be devised to be that the real purpose of the fee was an improper one  to stifle competition with some other existing format of the same business.... [Id. at 398-399]
Further, the interest of Totowa from a regulatory standpoint cannot be treated as substantial for the balancing of competing interests under the First and Fourteenth Amendments when it lets private entities decide whether the regulation shall apply.
To the extent that subsection 6(e)8 provides that churches may determine whether or not a claimed governmental interest will or will not be imposed it is invalid. Larkin v. Grendel's Den, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982).
The court concludes that subsection 6(e)8 is invalid as an infringement of the rights of the News to distribute, and the public to obtain, newspapers, guaranteed by the First and Fourteenth Amendments.
In respect to subsection 6(e)7 the planning and traffic engineer for Totowa stated that neither could give any reason related to his discipline which supported such a regulation.
There was no reason advanced from any other credible evidence to support this regulation. Monahan from the News expressed his opinion that if in Totowa, the News found that it *160 had to use two units within 100 feet, it would check other means of distribution to secure that circulation on a daily basis.
The court concludes that subsection 6(e)7 serves no substantial interest of Totowa and hence it is invalid.
Counsel for the News also urged that subsection 6(b) is so broad that it permits any enforcement officer to disregard the specific provisions in subsection 6(e)1 to 5. He urges that the word "unreasonably" is not sufficiently specific to prevent subjective criteria to be applied by the enforcing person.
The California Supreme Court in Kash Enterprises, Inc. v. City of Los Angeles, supra, held that "unreasonably" was an adequate standard to use.
Plaintiff ... attacks the segment of the ordinance which prohibits the placement of a newsrack in a location that "unreasonably interferes with or impedes the flow of pedestrian or vehicular traffic" (§ 42.00, subd. (f)(2)), asserting that the use of the term "unreasonably" renders the clause unduly vague and susceptible to arbitrary application. In Cameron v. Johnson (1968) 390 U.S. 611, 615-616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182, however, the United States Supreme Court rejected an almost identical vagueness attack on a Mississippi statute which prohibited "picketing ... in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any ... county ... courthouse." Justice Brennan, writing for the Cameron court, observed: "Appellants ... argue that the statute forbids picketing in terms `so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application....' [Citation.] But ... [t]he terms `obstruct' and `unreasonably interfere' plainly require no `guess[ing] at [their] meaning.' Appellants focus on the word `unreasonably.' It is a widely used and well understood word and clearly so when juxtaposed with `obstruct' and `interfere.' We conclude that the statute clearly and precisely delineates its reach in words of common understanding." (Fns. omitted.) This reasoning applies equally to the Los Angeles ordinance. [562 P.2d at 1308]
This court concludes that the above reasoning is equally applicable to subsections 6(b) 2, 3, and 4. If a newsrack were placed across the doorway to apartments over a store, the newsrack could meet all the criteria under subsection 6(e) and be held to be improperly placed under 6(b). But based on the credible testimony and the photographic evidence in the case, the last mentioned situation should be held to be a reasonable regulation of placement of newsracks. There is a reasonable *161 alternative means available to continue to distribute newspapers by newsracks: move the newsrack to a different location.
Based on the credible testimony and the plain meaning of the words used in subsection 6(b) the court finds that the standards in 6(b) 1 to 4 are sufficiently specific as not to be vague. The court concludes that subsection 6(b) is valid.
The court notes that the standards set forth in subsection 6(e) 1 to 6 are similar to those found in subsection 42:00(f)(3)(F) 1 to 4 and 7 and 8 of the ordinances of the City of Los Angeles considered by the California Supreme Court in Kash Enterprise, Inc. v. City of Los Angeles, supra. Those provisions are found below.[5] The California Supreme Court sustained them all as being reasonable against a facial attack on grounds of unreasonableness.
The standard for determining validity of a restraint that restricts a protected right under the First Amendment and Fourteenth Amendment was set forth by Justice Stevens in the majority opinion in Members of City Council v. Taxpayers for Vincent, supra:
In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court set forth the appropriate framework for reviewing a viewpoint neutral regulation of this kind:
"[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated *162 to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377, 88 S.Ct. at 1679. [104 S.Ct. 2129].
... The incidental restriction on expression which results from the City's attempt to accomplish such a purpose is considered justified as a reasonable regulation of the time, place, or manner of expression if it is narrowly tailored to serve that interest. See, e.g., Heffron v. Society for Krishna Consc., 452 U.S. 640, 647-648, 101 S.Ct. 2559, 2563-2564, 69 L.Ed.2d 298 (1981); Schad v. Mount Ephraim, 452 U.S. 61, 68-71, 101 S.Ct. 2176, 2182-2183, 68 L.Ed.2d 671 (1981); Carey v. Brown, 447 U.S. 455, 470-471, 100 S.Ct. 2286, 2295-2296, 65 L.Ed.2d 263 (1980); Grayned v. City of Rockford, 408 U.S. 104, 115-117, 92 S.Ct. 2294, 2302-2303, 33 L.Ed.2d 222 (1972); Police Department of Chicago v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972). The District Court found that the signs prohibited by the ordinance do constitute visual clutter and blight. By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy. The plurality wrote in Metromedia [v. City of San Diego]: "It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an `esthetic harm.'" 453 U.S. [490] at 510, 101 S.Ct. [2882] at 2893-2894 [69 L.Ed.2d 800]. The same is true of posted signs. [104 S.Ct. at 2130-2131]
Counsel for Totowa has urged that Totowa has a bona fide interest in keeping its sidewalks and streets in good condition and safe for passage. Chapter 115 of Totowa's code regulates construction of streets and sidewalks as well as mandating that they be kept clean and free of obstructions. Counsel also pointed to c. 99 of Totowa's code which is labeled property maintenance code to show that Totowa has attempted to keep the borough free of visual blight.
Counsel for Totowa also urges that the Legislature, in a number of laws affecting streets and sidewalks, has directed that consideration must be given to the needs of the handicapped, e.g., N.J.S.A. 52:32-14. In connection with getting contracts for the construction of new sidewalks or reconstruction or repair of old ones, a municipality must provide ramps for the handicapped.
In respect to subsection 6(e) 1 and 2, the court finds, based on the credible testimony, that they are aimed at the same problem and in a number of situations impose the same limitations. The credible testimony establishes that the New Jersey Department *163 of Transportation requires that a "marked crosswalk" be not less than six feet in width.
The credible testimony also establishes that on streets with curbs, the curb stops running in a straight line before the intersection and starts to curve. The point where the curb stops running in a straight line is referred to as the tangent point. The section of the curb that is curved between the two tangent points is called the curb return.
Based on the credible testimony the court finds that the purpose of these two provisions is to keep newsracks three feet from the area where pedestrians using the normal pedestrian crossing area would be walking.
The doors of the units in question are one foot ten inches in height. If a newsrack were allowed to be immediately adjacent to the extended lines of pedestrian travel, then a person opening the door of a newsrack to get a newspaper would be an obstacle that could impede pedestrians leaving the street, or attempting to enter the street.
Based on the credible testimony concerning engineering considerations for slightly over-designing for unanticipated situations, such as unusually large persons using the newsracks, designing highways for cars that travel in excess of the lawful speed limit for safety purposes, the court finds that subsection 6(e) 1 and 2 are reasonably tailored to Totowa's interest in not impeding pedestrian travel into and out of the streets. The restraint on those who would get a newspaper is no more rigorous than that they step a few paces out of the way of those who have no desire to wait in a street where motor vehicles have a right to travel. With the growing presence of those who use wheelchairs, the court believes the reasonableness of the restrictions will become patent.
The court concludes that they are valid.
The court does not find persuasive the contention that Totowa has not required utilities to relocate their poles, that there *164 may be mail boxes, that there may be telephone booths in those prohibited areas.
The utility pole's location is dictated by the lines it carries and location of other poles. A utility pole is not a center of activity at the sidewalk level.
In respect to the other two there is no more credible evidence to show a substantial number, if any, of mail boxes or telephone booths in such areas. If such problems exist, then Totowa, if it lacks power to correct the problem, can ask those who have power to correct it.
Based on the credible testimony, the court finds that the purpose for subsection 6(e)3 is to prevent a newsrack from blocking persons who need to use such items. No one questioned the restriction as to fire hydrants.
Counsel for the News urged that "other emergency facility" was too vague. The words associated with it suggest that it means equipment and or tools to be used to save lives or property such as a life preserver or other means of summoning help, such as the newer call boxes that use telephones instead of a pull switch which displays the location, or announces it by bells, at a station house.
The credible testimony establishes the need for clearance for handicapped in wheelchairs, younger persons, and smaller persons not to have to reach across a newsrack to get a call box. The court concludes that the limitation is reasonable and related to the need of Totowa and is therefore valid.
In respect to subsection 6(e)4, the witnesses for Totowa testified that there are many driveways in Totowa that are ten feet in width and either adjacent to a building or between two buildings. Drivers under such circumstances tend to curve to the left or right across an area adjacent to the driveway.
The purpose of the limitation is to keep the newsracks and individuals using them out of areas where they might be *165 struck, as well as not impeding vehicles entering or leaving streets and crossing sidewalks.
There is also credible testimony that as the width of a driveway increases, the tendency of drivers of particularly large vehicles like tractor trailers to ride over the curb diminishes. Counsel for the News urges that the standard to be the least restrictive should be calculated on a graduated scale as the width of the driveway increases.
Based on the credible testimony the court finds that the present limitation would not preclude the location of any newsrack. Some might have to be moved slightly. Some tolerance, if reasonable, must be allowed to municipalities in framing limitations that are related to needs. There is nothing in the record to show the number of 20-foot driveways or areas where 20-foot driveways may be developed. In looking at the map, certain areas where no streets appear, particularly near the river, are large cemeteries which have existed for over 50 years.
The court concludes that the limitation in subsection 6(e)4 is reasonable under the conditions found in this record.
In respect to subsection 6(e)6, the experts for Totowa testified that the purpose of that limitation was to prevent newsracks from interfering with the maintenance workers tending those areas.
Based on the credible testimony the court finds that said subsection was not aimed at the strip between the curb and the sidewalk area in which one sometimes finds grass or trees. But that said subsection is designed to regulate the area of the public easement on the other side where a lawn or park might be located and lawnmowers used.
Counsel for the News urges that if that was the purpose then there should have been a prohibition against park benches, litter baskets, etc., that might be placed in that area as well. Many of the objects which that argument embraces are ones *166 that Totowa would in its various departments locate. Totowa can control those problems by direction of orders from the heads of operating departments.
Based on the evidence, the court does not find that this subsection was inserted as an attempt to single out newspapers for discrimination.
The limitation is reasonably related to the interest of Totowa in seeing that property is kept orderly. The property maintenance code was adopted before ordinance 09-83. It is designed to further the aesthetics of Totowa. That is a purpose for which Totowa may regulate. Cf. State v. Miller, 83 N.J. 402, 409-410 (1980).
The court finds that the limitation is reasonably related to the interest of Totowa sought to be protected. The court concludes that it is valid.
In respect to subsection 6(e)5, the credible testimony establishes that outside of the business district the width of most paved sidewalks is four feet.
If a newsrack were located in a residential area in the area between the curb and sidewalk, a person standing on the sidewalk and using the newsrack might impede persons using the four-foot walkway. Such impediment however is not comparable to the impediments to persons trying to get out of a marked crosswalk.
One expert for Totowa suggested that a waiver might be given for residential areas. This would in essence bar the News from placing a newsrack until it obtained a waiver and thereby create a prior restraint.
The limitation imposed is not related to a need for a six-foot passageway because none exist in the areas under consideration. The court concludes that the limitation in subsection 6(e)5 is not valid as written.
The officials, experts, and attorneys for Totowa may want to rewrite the provision in terms of zones under the zoning ordinance *167 which may reflect the conditions as they exist. But in the meantime, the News should not be barred from placing newsracks in residential areas.
Based on the credible testimony, the court finds that subsections 6(a) and 6(c) are related to safety interests of Totowa and concludes that they are valid. In respect to subsection 6(d) the credible testimony establishes that the purpose of this limitation is to prevent the assembling of a wall of newsracks along a curb that would impede pedestrians from getting out of the street and persons from getting out of their cars. The need of Totowa is safety. This limitation is related to that.
Counsel for the News urges that this limitation is unenforceable because Totowa has no records from which it can determine who were the first boxes there and had a right to be there up to the four-foot limit.
The court concludes that is a problem for a different forum  Totowa may be able to gather witnesses with knowledge. Totowa may be able to gather the information by other means.
Unlike its counterpart in the ordinance construed in Kash Enterprises, supra, which this court has not reproduced, there is no specification for a distance between a group of newsracks and another newsrack or group thereof.
The court finds the limitation is related to Totowa's need of safety for persons exiting from the street and aesthetics. The court concludes that the limitation is valid. But the court directs that the judgment to be entered in this case shall provide that, within a specific time period, ordinance 09-83 is to be amended to state a distance for separation between a group of newsracks and the next newsrack or group of newsracks.
The court has not recited in detail the testimony concerning each location. The court's decision that newsracks on private property are not covered makes it unnecessary to do that. As to the others in public areas, they either are in compliance or with a slight movement will be.
*168 The witnesses for Totowa in testifying about specific locations stated that the newsrack would result in violation of other ordinances by other people, e.g., a driver stopping a car in a no parking zone to get a newspaper.
The United States Supreme Court has repeatedly said that you cannot ban distribution of printed matter because someone may litter the street. A municipality should cite the person littering the street. See Schneider v. State, supra.
Such factors cannot be a basis for regulation.
Based on the court's determination that a number of the regulatory provisions are valid, the court determines that it should not, and does not, hold the entire ordinance invalid. The court determines that only those provisions found to be invalid shall be stricken and the ordinance shall survive.
Counsel for Totowa shall submit a judgment consistent with this decision.
NOTES
[1] That this Newsrack is in violation of Ordinance No. 09-83 entitled "An Ordinance for the Placement of Newsracks on Public SIDEWALKS OR IN ANY OTHER PLACE IN THE BOROUGH OF TOTOWA," AND AS SUCH MUST BE IMMEDIATELY REMOVED.

FAILURE TO ABIDE BY THIS NOTICE WILL RESULT IN THIS MACHINE BEING CONFISCATED WITHIN FORTY-EIGHT HOURS FROM THE DATE HEREOF, AND SUMMONS BEING ISSUED. YOU MUST IMMEDIATELY CONTACT PAUL CURCIO AT 256-6670 or 956-1007.
 PAUL CURCIO
 Construction Code Official
 Borough of Totowa

[2] Section 2. Permit Required:

It shall be unlawful for any person, firm or corporation to erect, place, maintain or operate on any public street or sidewalk, or in any other public way or place, in the Borough of Totowa any newsrack without first having obtained a permit from the Borough Clerk specifying the exact location of such newsrack or newsracks. One permit may be issued to include any number of newsracks and shall be signed by the applicant.
Section 3. Application for Permit:
Application for such permit shall be made, in writing, to the Borough Clerk, and approved by the Mayor and Council upon such form as shall be provided by them and shall contain the name and address of the applicant, the proposed specific location of said newsrack or newsracks and shall be signed by the applicant.
Section 4. Conditions for Permit:
(a) Permits may be issued for the installation of a newsrack or newsracks without prior inspection of the location but, such newsrack or newsracks and the installation, use or maintenance thereof, shall be conditioned upon observance of the provisions of this Ordinance. An annual permit fee of $10.00 per newsrack is required.
(b) Such permits shall be valid for a period of one year beginning June 1, and expiring on May 31 of the following year, and shall be renewable pursuant to the procedure for original applications referred to in Section 3 and upon payment of the $10.00 per newsrack permit fee.
(c) No permit shall be issued or continued in operation unless the applicant and any other persons, organizations, firms or corporations on whose behalf the application is made, by filing such application, do represent, stipulate, contract and agree that they will jointly and severally defend, indemnify and hold the borough harmless against liability for any and all claims for damage to property, or injury to or death of persons, arising out of or resulting from the issuance of the permit or the control, maintenance or ownership of the newsracks permitted.
(d) Before a newsrack permit is issued to any person, that person must execute an indemnification agreement substantially as follows:
"The applicant and any other persons, organizations, firms, or corporations on whose behalf the application is made, represent, stipulate, contract and agree that they do jointly and severally defend, indemnify and hold harmless the Borough of Totowa against liability for any and all claims for damage to property, or injury to or death of persons, arising out of or resulting from the issuance of the permit of the control, maintenance or ownership of the newsracks permitted."
(e) Before the issuing authority may issue a newsrack permit to any person, that person must file with the Borough Clerk an insurance policy of a company duly licensed to transact business under the insurance laws of this State in the sum of $1,000,000.00 against loss from liability imposed by law upon the distributor for damages on account of bodily injury or death, suffered by any one person, and in the sum of $50,000.00 against loss on account of property damage suffered by any person or persons as a result of an accident occurring by reason of the ownership, control or maintenance of the newsracks permitted, and no license shall [sic] continue effective unless such insurance in the full and collectible amount of $1,000,000.00 for one person and $1,000,000.00 for more than one person for bodily injuries or death and $50,000.00 for property damage shall remain in force during the entire term of the license. Such insurance policy shall provide for the payment of and final judgment recovered by any person on account of the ownership, maintenance and control of such newsracks or any fault in respect thereto and shall be for the benefit of any person suffering loss, damage or injury as aforesaid.
[3] Section 5. Standards for Maintenance and Installation:

Any newsrack which in whole or in part rests upon, or over any public sidewalk or parkway, shall comply with the following standards:
(a) No newsrack shall exceed 60 inches in height, 24 inches in width or 20 inches in thickness.
(b) No newsrack shall be used for advertising signs or publicity purposes other than that dealing with the display, sale or purchase of the newspaper sold therein.
(c) Each newsrack shall be equipped with a coin return mechanism to permit a person using the machine to secure an immediate refund in the event he is unable to receive the publication paid for. The coin return mechanisms shall be maintained in good working order.
(d) Each newsrack shall have affixed to it a readily visible place so as to be seen by anyone using the newsrack a notice setting forth the name and address of the distributor and the telephone number of a working telephone service to call to report a malfunction or to secure a refund in the event of a malfunction of the coin return mechanism, or to give the notices provided for in this Ordinance.
(e) Each newsrack shall be maintained in a neat and clean condition and in good repair at all times. Specifically, but without limiting the generality of the foregoing, each newsrack shall be serviced and maintained so that
1. It is reasonably free of chipped, faded, peeling and cracked paint in the visible painted areas thereof;
2. It is reasonably free of rust and corrosion, in the visible unpainted metal areas thereon.
3. The clear plastic or glass parts hereof, if any, through which the publications therein are viewed, are unbroken and reasonably free of cracks, dents, blemishes and discolorations.
4. The paper or cardboard parts of inserts thereof, if any, are reasonably free of tears, peeling or fading.
5. The structural parts thereof are not broken or unduly misshapen.
(f) It shall be unlawful for any person or place to maintain any publication of material in newsracks which exposes to public view any pictorial material which depicts or appears to depict nudity or offensive sexually explicit material.
Section 1. Definitions:
....
d. Nudity means the showing of less than a fully opague covering of the genital, pubic hair, buttocks, natal cleft, perineum, anus or anal region of any person, other than a child under the age of puberty, or any portion of the breast at or below the areola thereof, of any female person, other than a child under the age of puberty, or the depiction of covered male genitals in a discernible turgid state.
e. Offensive means that the work in which the representatives appear, taken as a whole, appeals to the prurient interest and patently depicts or portrays the prohibited sexually explicit material in a manner which, taken as a whole, lacks, serious literary, artistic, political or scientific value.
f. Pictorial Material means any material suggesting or conveying a visual image, and includes, but is not limited to, a photograph, painting or drawing.
....
h. Sexually explicit material means any pictorial material depicting human sexual intercourse, husband or animal masturbation, bestiality, oral intercourse and intercourse, human animal intercourse, excretory functions, homosexual acts, direct physical stimulation or touching of unclothed genitals or pubic areas of the human male or female, flagellation or torture by or upon a person in the context of a sexual relationship or sexual stimulation. The material shall be judged without regard to any covering which may be affixed or printed over the material in order to oscure genital areas in a depiction otherwise falling within the definition of these Subsections. Works or art or of anthropological significance are not included within the definition of this Subsection.
[4] Section 6. Location and Placement of Newsrack:

Any newsrack which rests in whole or in part upon, or on any portion of a public right-of-way or which projects onto, into or over any part of a public right-of-way shall be located in accordance with the provisions of this Section;
(a) No newsrack shall be used or maintained which projects onto, into, or over any part of the roadway of any public street, or which rests, wholly or in part upon, along or over any portion of the roadway of any public street.
(b) No newsrack shall be permitted to rest upon, in or over any public sidewalk, when such installation, use or maintenance:
1. Endangers the safety of persons or property; or
2. Unreasonably interfers with or impedes the flow of pedestrians or vehicular traffic, including any legally parked or stopped vehicle; or
3. Unreasonably interferes with the ingress or egress from any residence or place of business; or
4. Unreasonably interferes with the use of traffic signs or signals, hydrants or mailboxes permitted at or near said location.
(c) Newsrack or newsracks shall be chained, bolted or otherwise secured so as to prevent their being blown down or around the public right-of-way.
(d) Newsracks may be placed next to each other, provided that no group of newsracks shall extend for a distance of more than four (4) feet along a curb.
(e) No newsrack shall be placed, installed, used or maintained:
1. Within three (3) feet of any marked crosswalk;
2. Within twelve (12) feet of a curb return of any unmarked crosswalk;
3. Within five (5) feet of any fire hydrant, fire call box, police call box or other emergency facility;
4. Within five (5) feet of any driveway;
5. At any location whereby the clear space for the passage way of pedestrians is reduced to less than six (6) feet.
6. Within three (3) feet of or on any public area improved with lawn, flowers, shrubs, trees, or other landscaping.
7. Within one hundred (100) feet of any other newsrack on the same side of the street in the same block containing the same issue or edition of the same publication.
8. Within two hundred (200) feet of any church, park, playground, or public schoolhouse or private schoolhouse not conducted for pecuinary profit or any store which, as of the date of this ordinance, offered newspapers for sale. Said two hundred feet shall be measured in the normal way that a pedestrian would properly walk from the nearest entrance of said church, park, playground, school or store to the location of the newsrack sought to be permitted. The limitations of this subsection may be waived at the issuance of the license and at each renewal thereafter on authority of such church, school or store, such waiver to be effective until the date of the next renewal of the license.
[5] (F) No news rack shall be placed, installed, used or maintained:

"1) Within three feet of any marked crosswalk.
"2) Within fifteen feet of the curb return of any unmarked crosswalk.
"3) Within three feet of any fire hydrant, fire call box, police call box or other emergency facility.
"4) Within three feet of any driveway.
....
"7) At any location whereby the clear space for the passageway of pedestrians is reduced to less than six feet.
"8) Within three feet of any area improved with lawn, flowers, shrubs or trees or within three feet of any display window of any building abutting the sidewalk or parkway or in such manner as to impede or interfere with the reasonable use of such window for display purposes."