**Harlan L. JACOBSEN, Editor/Publisher of Solo RFD, Plaintiff,**

**v.**

**Scott LAMBERS, et al., Defendants.**

**Civ. A. No. 94–2440–KHV.**

United States District Court, D. Kansas.

May 9, 1995.

Harlan L. Jacobsen, Sioux Falls, SD, pro se.

Robert L. Bezek, Jr., Anderson, Byrd, Richeson & Flaherty, Ottawa, KS and Michael K. Seck, Fisher, Patterson, Sayler & Smith, Overland Park, KS, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Harlan L. Jacobsen edits and publishes a singles newspaper called *Solo RFD*. After the City of Ottawa, Kansas, seized his newsrack, arrested him, and charged him with the crime of distributing newspapers without a license, Jacobsen filed suit for declaratory and injunctive relief and damages under 42 U.S.C. § 1983. Jacobsen claims that the city ordinance under which he has been prosecuted, and his property seized, is unconstitutional. More specifically, Jacobsen claims that Ordinance No. 3103–94 violates his rights under the First Amendment of the United States Constitution and that the city officials who enforced that ordinance violated his rights under the First, Fifth and Fourteenth Amendments. In particular, Jacobsen seeks relief from City Manager Scott Lambers and city police officer Merle Taylor in their individual and official capacities.

This matter comes before the Court on *Defendants' Motion for Summary Judgment* (Doc. # 22), filed April 3, 1995. For reasons stated below, the Court finds that said motion should be sustained in part and overruled in part.

### Summary Judgment Standards

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202

(1986). Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 893 (10th Cir.1994). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest on its pleadings, but must set forth specific facts showing that there is a genuine issue for trial...." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in the light most favorable to the nonmoving party, *e.g.*, *Thrasher v. B & B Chem. Co., Inc.*, 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–14.

### Uncontroverted Facts

The following facts are undisputed for purposes of this motion:

In June or July of 1994, Harlan L. Jacobsen, a resident of South Dakota, installed a newsrack on a public sidewalk in front of the post office in Ottawa, Kansas.[1] When he returned a month later to deliver more papers, he learned that the newsrack was missing. Jacobsen called the post office on or

---

1. Ottawa is a city of the second class and has a city commission/city manager plan form of government pursuant to K.S.A. § 12–1001 *et seq.*

about September 24, 1994, and spoke to a maintenance person who said that the post office had not removed the newsrack. Immediately after this conversation, Jacobsen faxed to the Ottawa City Attorney, Forrest Lowry, copies of a federal court order from the United States District Court for the District of Arizona. This order purported to prohibit all United States post offices from interfering with Jacobsen's right to place newsracks in front of post offices. Jacobsen also faxed Lowry an article concerning a court order which purported to bar the City of Omaha, Nebraska, from charging a license fee for the sale of newspapers.

Within 24 hours, Jacobsen received a telephone call from Scott Lambers, Ottawa City Manager. Lambers is responsible for administering of all city affairs, including the enforcement of municipal laws and ordinances, under K.S.A. § 12–1014. Lambers told Jacobsen that the city had not removed his newsrack but that he would check to see where the newsrack was. He suggested that Jacobsen should call the police.

Shortly after the conversation with Lambers, Jacobsen received a letter dated September 30, 1994, from Ottawa Police Chief Jeffrey Herrman. Herrman indicated that the post office had removed the newsrack and placed it on the side of the post office building (from whence it disappeared). Hermann also informed Jacobsen that city approval was required for placement of a newsrack.

In response to Hermann's letter, Jacobsen called Lambers. Jacobsen told Lambers that he would be in Ottawa to install another newsrack on Friday or Saturday. Jacobsen and Lambers agreed that Jacobsen would put the newsrack in the same place in front of the post office, but that Jacobsen would

not cable it to a traffic sign. Because Lambers had not been aware of Herrman's letter, he asked Jacobsen to fax him a copy. Lambers also informed Jacobsen that the newsracks were not prohibited.

Jacobsen arrived in Ottawa on October 1, 1994, at approximately 4:00 p.m. As he unloaded the newsrack at the post office, a police car arrived, and an officer told Jacobsen that a City of Ottawa ordinance required a permit for such newsracks. Two additional police cars then appeared, and city police officer Merle Taylor arrived on the scene. Jacobsen told Taylor about his agreement with Lambers and suggested Taylor contact Lambers about the situation. Instead, Taylor talked to his captain, who ordered that "either Jacobsen moves the newsrack or they ... arrest him." Taylor therefore ordered Jacobsen's arrest.[2]

After taking him into custody, officers charged Jacobsen with violating Ordinance No. 3103–94, Section 11–402a of the Ottawa Municipal Code. That ordinance, which purports to define, regulate, and license itinerant salesmen, merchants, solicitors, and vendors, is attached hereto as Exhibit A.

Lambers now believes that the ordinance required Jacobsen to obtain a city license before placing his newsrack on a public sidewalk. Jacobsen neither sought nor obtained such a license, although Lambers claims that the city would have issued one if Jacobsen had completed the necessary application and paid the requisite fee. According to Lambers, that fee—$25.00 for each 14–day period—is intended to cover the administrative cost of licensure.

Jacobsen sues Lambers and Taylor in their individual and official capacities, seeking declaratory and injunctive relief and actual and punitive damages. Jacobsen claims that de-

**2.** Lambers had no further conversations with Jacobsen concerning the installation of newsracks or Jacobsen's arrest on October 1, 1994.

The record contains no evidence that Lambers instructed any officer to arrest Jacobsen or seize his newsrack, and Lambers was not present at the time of the arrest. Lambers did not have any conversations concerning Jacobsen with the police department until after the arrest.

Jacobsen believes that Lambers and Taylor did not like his newspaper. He believes that other

newspapers were allowed on the street, although he cannot recall whether he saw any such newspapers before or after October 1, 1994. Jacobsen is not aware of any facts which suggest that defendants had read his newspaper before October 1, 1994, or that they disfavored the speech contained in it. Lambers in fact did not see *Solo RFD* until after Jacobsen had filed suit. He was not advised until then of its contents or its target audience, and he had no opinion whether it was objectionable.

fendants are liable under 42 U.S.C. § 1983 because, in violation of his rights under the First, Fifth, and Fourteenth Amendments and pursuant to an ordinance which is unconstitutional both facially and as applied, defendants seized his property, arrested him, and prevented him from distributing his newspaper through channels guaranteed by the First Amendment.

Defendants seek summary judgment. First, they assert that the ordinance in question is not unconstitutional on its face or as applied because it is content-neutral, gives city officials no discretion with regard to issuance of licenses, and imposes only a reasonable licensure fee sufficient to cover administrative costs. Second, defendants assert that plaintiff has failed to demonstrate that they are unprotected by the doctrine of qualified immunity and are otherwise subject to liability. Finally, defendants argue that plaintiff has failed to demonstrate that defendants were responsible in their official capacities for creating the policy or procedure which violated plaintiff's constitutional rights. Accordingly, defendants insist that they are entitled to judgment as a matter of law.

### Analysis

#### A. *Constitutionality of Ordinance No. 3103–94*

In his complaint, Jacobsen asks the Court to declare that Ordinance No. 3103–94 is unconstitutional, both on its face and as applied. Defendants contend that the ordinance is constitutional on both fronts because it is content-neutral, does not give the city unbridled discretion with respect to issuance, and does not place unreasonable restrictions upon plaintiff's ability to disseminate his message.[3]

Preliminarily, we note that Ordinance No. 3103–94 is a law of general applicability which purports to define, regulate and license itinerant salesmen, merchants, solicitors and vendors. As such, it is not aimed at expressive activity or at conduct commonly associated with speech. Plaintiff does not argue that the ordinance has *no* valid application, but only that as written, it cannot constitutionally be applied to activity protected by the First Amendment. Consequently, plaintiff's attack on the ordinance is a challenge to the ordinance as applied, and the Court limits its analysis to the concrete case before it. *See City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 802–03, 104 S.Ct. 2118, 2127, 80 L.Ed.2d 772 (1984); *Jacobsen v. Peterson,* 728 F.Supp. 1415, 1419 (D.S.D.1990).

■ The First Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment, *Bigelow v. Virginia,* 421 U.S. 809, 811, 95 S.Ct. 2222, 2227, 44 L.Ed.2d 600 (1975), and defendants do not dispute that the use of newsracks to distribute newspapers is a constitutionally protected activity. Indeed, it has "long been settled" that the First Amendment protects distribution as well as publication of protected material, and that newsracks play an essential part in the Constitution's guarantee of freedom of expression. *See, e.g., Multimedia Publishing Co. v. Greenville–Spartanburg Airport Dist.,* 991 F.2d 154, 158 (4th Cir. 1993), citing *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). The Supreme Court recognized, more than 100 years ago, that "[l]iberty of circulating is as essential ... as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877). Furthermore, public streets and sidewalks have been recognized as "public fora," traditional places where people may exercise their First Amendment rights. See *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), in which the Supreme Court made the following comments:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for pur-

---

**3.** Plaintiff claims that the city administers the license requirement in a manner which discriminates on the basis of content, in violation of the First Amendment and the equal protection guarantees of the Fourteenth Amendment, and that defendants are guilty of selective enforcement. Jacobsen never applied for a license, however, and he has no evidence of these claims. Defendants are therefore entitled to summary judgment on these claims.

poses of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Id.* at 515–16, 59 S.Ct. at 964.

■ The First Amendment rights of publication and circulation, which are fundamentally intertwined throughout American jurisprudence, demand that public sidewalks be viewed as public fora and, thus, appropriate places to engage in the constitutionally protected activity of distributing newspapers through newsracks. *See, e.g., Jacobsen v. United States Postal Serv.,* 812 F.2d 1151, 1153 (9th Cir.1987); *Jacobsen v. Petersen,* 728 F.Supp. at 1419.

■ It is of course true that the First Amendment does not confer an absolute right of access to public property for the sale of newspapers through newsracks. *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,* 847 F.Supp. 178, 191 (D.Mass.1994). A city may regulate the time, place and manner of activity in a public forum,[4] provided that the regulation is content-neutral,[5] is narrowly tailored to serve an important governmental interest,[6] and leaves open ample alternative channels of communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). The government's right to limit expressive activity in traditional public fora is, however, "sharply circumscribed." *Id.*

■ Under the narrow-tailoring requirement, the city has the burden of establishing a "reasonable fit" between the legislature's ends and the means chosen to accomplish those ends. *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989). The test is not whether the restriction is "absolutely the least severe that will achieve the desired end," but whether the restriction—if not necessarily the "single best disposition" of the matter—is "narrowly tailored to achieve the desired objective." *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 12, 113 S.Ct. 1505, 1510 n. 12, 123 L.Ed.2d 99 (1993).

■ Applying this analysis to Ordinance No. 3103–94, the Court must deny defendants' request for a summary determination that the regulation, as applied, is constitutional. First, as noted above, the Constitution requires that any restriction on newsracks serve an important governmental interest. Ordinance No. 3103–94 identifies no such interest, and defendants, in seeking summary judgment, are likewise silent on this issue.[7] Defendants have wholly failed to

---

**4.** Cases outlining permissible restrictions on the time, place and manner of newsracks are legion. *E.g., Jacobsen v. Harris,* 869 F.2d 1172 (8th Cir. 1989); *Jacobsen v. Crivaro,* 851 F.2d 1067 (8th Cir.1988); *Gannett Satellite Information Network, Inc. v. Township of Pennsauken,* 709 F.Supp. 530 (D.N.J.1989); *Duffy v. City of Arcadia,* 195 Cal. App.3d 308, 243 Cal.Rptr. 87 (1987); *News Printing Co. v. Borough of Totowa,* 211 N.J.Super. 121, 511 A.2d 139 (1986); *Kash Enterprises, Inc. v. City of Los Angeles,* 19 Cal.3d 294, 138 Cal. Rptr. 53, 562 P.2d 1302 (1977).

**5.** The Supreme Court has described content-neutral speech restrictions as those which "are justified without reference to the content of the regulated speech." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

**6.** Courts have held that public safety and convenience, preservation of revenue, and aesthetic beauty, among others, are important government interests. *See, e.g., City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. at 2128; *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981); *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *Multimedia Publishing,* 991 F.2d at 161; *Gannett Satellite,* 709 F.Supp. at 536–37.

**7.** At argument, defense counsel suggested that the ordinance is intended to protect members of the public from unscrupulous vendors of the itinerant sort. This argument fails to establish an important governmental interest for two reasons. First, defendants have not established

prove—either legally or as a matter of undisputed fact—that Ordinance No. 3103–94 is narrowly tailored to meet an important government interest.

■ The *Affidavit of Scott Lambers* offers the following, somewhat cryptic, explanation of the ordinance's function:

> I interpret the Ordinance to require the City to issue a license to an individual such as Harlan Jacobsen upon the completion of an application and the payment of a $25.00 fee. The $25.00 fee is to cover administrative costs involved in completing the licensing procedure.

Not only does this statement fail to articulate an important governmental interest behind the ordinance, defendants also fail to offer any evidence that the administrative cost of a license is even approximately $25.00 on an annual, bi-weekly, or other recurring basis. Nor do they explain the fact that the ordinance requires payment of a license fee and submission of a comprehensive license application *every two weeks.* Defendants concede that in order for a license fee to be permissible, a municipality may charge no more than the amount necessary to cover administrative costs. *See Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941) (no constitutional infirmity in license fee limited to expense incident to administration of statute and maintenance of public order in the matter licensed); *see also Jacobsen v. Harris,* 869 F.2d 1172, 1174 (8th Cir. 1989); *Jacobsen v. Crivaro,* 851 F.2d 1067, 1071 (8th Cir.1988); *Gold Coast Publications, Inc. v. Corrigan,* 798 F.Supp. 1558, 1572 (S.D.Fla.1992), *rev'd in part on other grounds,* 42 F.3d 1336 (11th Cir.1994).

To sustain defendants' motion for summary judgment, the Court would have to endorse blindly the conclusory argument that Ordinance No. 3101–94 "does not place unreasonable restrictions upon the plaintiff's ability to disseminate his message." This, the Court cannot do. If the Court were to reach any conclusion on the limited record before it, the opposite one would prevail. Defendant's motion for summary judgment

on the constitutionality of Ordinance No. 3103–94 is therefore overruled.

**B.** *Individual Liability of Lambers and Taylor*

Defendants argue that as a matter of law, all claims against them in their individual capacities should be dismissed. First, defendants argue that they are entitled to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Second, defendants argue that even if they are not shielded by qualified immunity, plaintiff's allegations against them have no factual support.

**1.** *Qualified Immunity*

■ Defendants claim the affirmative defense of qualified immunity from plaintiff's claim under Section 1983. Qualified immunity is sometimes referred to as "good faith immunity." *Quezada v. County of Bernalillo,* 944 F.2d 710, 718 (10th Cir.1991) The Tenth Circuit has explained qualified immunity as follows:

> Qualified immunity is an affirmative defense that protects government officials from personal liability unless their actions violate clearly established law of which a reasonable person would have known. Once the defense has been raised and the plaintiffs have met their burden of identifying both the clearly established law that the government official is alleged to have violated and the conduct that violated that law, the defendant must demonstrate that no material issues of fact remain as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time. A defendant who makes such a showing of objective reasonableness is entitled to summary judgment unless the plaintiff can demonstrate that there are factual disputes relevant to the defendant's claim to immunity.

*Coen v. Runner,* 854 F.2d 374, 377 (10th Cir.1988) (internal citations omitted).

---

through affidavit or other competent evidence that this is indeed the purpose of Ordinance No. 3103–94. Second, broad assertions of a safety interest, without evidence to support them, cannot survive First Amendment scrutiny. *Gannett Satellite,* 709 F.Supp. at 536–37.

When a defendant raises the issue of a qualified immunity, the plaintiff must make a twofold showing. First, the plaintiff must show " 'that the [public official's] alleged conduct violated the law.' " *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 779 (10th Cir. 1993), citing *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988). Second, the plaintiff must show " 'that the law was clearly established when the alleged violation occurred.' " *Id.* The Tenth Circuit has recently articulated the first prong of this two-part inquiry as follows:

> In order to carry his burden, the plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it. Rather, the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity, and "demonstrate a 'substantial correspondence between the conduct in question and the prior law ... establishing that the defendant's actions were clearly prohibited.' " "Unless such a showing is made, the defendant prevails."

*Romero v. Fay,* 45 F.3d 1472, 1475 (10th Cir.1995) (internal citations omitted). To ascertain whether a plaintiff has met his burden, the district court must look at the asserted facts in his complaint and response to defendant's motion for summary judgment. *Id.* at 1478, citing *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991).

By virtue of the foregoing analysis concerning the constitutionality of Ordinance No. 3103–94, the Court is satisfied that plaintiff has established a prima facie case that in arresting defendant and seizing his property for failure to obtain a city license under Ordinance No. 3103–94, defendants violated plaintiff's rights under the First Amendment of the United States Constitution.

Once plaintiff demonstrates that the public official's alleged conduct violated the law, plaintiff must show that the law was "clearly established" when the alleged violation occurred. *Hinton,* 997 F.2d at 779, citing *Pueblo Neighborhood,* 847 F.2d at 646. Although the official's exact actions need not have been held previously unlawful, it must be apparent from pre-existing law that the acts were unlawful. *Anderson v. Creighton,* 483 U.S. 635, 640–41, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). This means that even if plaintiff's rights were in fact violated, defendants are entitled to qualified immunity if officials of reasonable competence would disagree as to whether their conduct violated plaintiff's clearly established federal right. *Bailey v. Kenney,* 791 F.Supp. 1511, 1516 (D.Kan.1992).

Defendants do not deny that if the ordinance was unconstitutional, plaintiff was subjected to an unlawful arrest and seizure of his person and property. They do not deny that if the ordinance was unconstitutional, plaintiff's First Amendment rights suffer ongoing infringement because the City of Ottawa has refused to allow him to place his newsrack on a public sidewalk. Defendants argue instead that the law governing resolution of this matter was not "clearly established" at the time of plaintiff's arrest because: (1) where prior decisions on an issue are conflicting, the right is not "clearly established"; and (2) the unconstitutionality of the ordinance "depends greatly upon its interpretation by the Court as applied to the specific factual situation at hand." These arguments, if technically correct, miss the mark.

The law with respect to newspaper racks was well-established by case law prior to October 1, 1994. It has long been clear that only those license fees necessary to cover administrative costs of licensure may be constitutionally assessed in situations where infringement of First Amendment rights is implicated. *See supra* Section A. Defendants point to no contrary legal authority on this issue, and they have failed to cite a single instance in which a court has bestowed its constitutional blessing on an ordinance similar to that involved in this case—one which on a daily basis subjects a newspaper vendor to criminal fines ranging from $100.00 to $500.00, imprisonment not to exceed 60 days, or both, all for failure to undergo a semi-weekly licensure procedure which involves payment of $25.00 fee and completion

of a comprehensive license application.[8] For these reasons, the Court is satisfied that the law concerning this matter was clearly established on October 1, 1994, when the alleged violation occurred. Thus, plaintiff has presented a prima facie case that defendants' conduct violated the law and that the law was clearly established at the time of the violation.

### 2. Factual Support for Plaintiff's Allegations

Denied the shield of qualified immunity, defendants bear the usual burden of parties moving for summary judgment: to show that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. More specifically, defendants must show that there are no material factual disputes as to whether their actions were "objectively reasonable in light of the law and the information [they] possessed at the time." *Coen,* 854 F.2d at 377. In determining whether defendants have satisfied their respective burdens, we evaluate the evidence in the light most favorable to the nonmoving party. *Hinton,* 997 F.2d at 779. The standard is one of "objective legal reasonableness" in light of the legal rules that were "clearly established" at the time the challenged action took place. *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39. Whether the official violated clearly established law is both a legal and a fact specific question that depends upon all the circumstances facing the official at the time the alleged violation occurred. *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039–40.

On this record, neither defendant has established an absence of material factual dispute as to whether his actions were objectively reasonable in light of the law and the information he possessed at the time. For that matter, defendants do not even argue that their conduct was objectively reasonable. While plaintiffs argue that "reasonable minds could differ" as to the constitutionality of Ordinance No. 3103–94, neither defendant professes to have entertained any belief (objectively reasonable or not) that the ordinance was constitutional. Although the record is not entirely clear on this point, it seems that Lambers entertained at least some level of subjective doubt that the ordinance was lawful. According to his affidavit:

> Sometime in late September of 1994, I received a call from Mr. Jacobsen during which I indicated that it was permissible to install a newsrack. Sometime later but before October 1, 1994, I received another call from Mr. Jacobsen indicating that he had received a letter from Jeffrey Herrman, Chief of Police of the City of Ottawa, indicating that the newsracks were prohibited. I was not aware of Chief Herrman's letter and asked Mr. Jacobsen to fax a copy of the letter to me. I informed Mr. Jacobsen that the newsracks were not prohibited and again agreed to permit him to put a newsrack on the perimeter sidewalk in front of the United States Post Office. I did ask that he not chain the rack to the signpost.

*Affidavit of Scott Lambers,* paragraph 5.

As to arresting officer Taylor, the record is undisputed that Jacobsen asked Taylor to contact Lambers and told Taylor about the agreement he had reached with Lambers concerning placement of the newsrack. Taylor's thoughts on the matter are undisclosed, except that "Taylor talked to his Captain who indicated Jacobsen move the newsrack or they would arrest him." As noted, neither defendant has submitted any evidence of even a subjective belief—let alone an objectively reasonable belief—that his actions

---

**8.** For purposes of this analysis, the Court assumes that Ordinance No. 3103–94 is not void for vagueness and that it properly applies to plaintiff in this case. However, we note that to say the ordinance is poorly drafted is a substantial understatement. To begin with, the ordinance takes great pains to define various categories of itinerant salespeople, *i.e.,* "itinerant solicitors," "itinerant merchants," "itinerant vendors," "itinerant salesmen," and "seasonal itinerant vendors." Having done so at length, the ordinance then singles out "itinerant merchants" and subjects this class alone to the license requirement imposed in Section 2. Jacobsen is arguably an "itinerant salesman," if one views his newsrack as a "stand temporarily located on the public streets or sidewalks" of Ottawa. The ordinance does not require "itinerant salesmen" to obtain licenses, however, and while it does *define* "itinerant salesmen," the ordinance makes no further mention of their activities and imposes no obligations upon them.

were reasonable in light of the law and the information he possessed at the time.

It is not enough for Lambers to argue that he was absent from the arrest scene, did not direct the police to arrest Jacobsen, and had no authority to "instruct the city police department as to how or when to make arrests ... [or] authority to dismiss criminal actions once an arrest has been made." Under K.S.A. § 12–1014, Lambers is responsible for administering all city affairs, including the enforcement of municipal laws and ordinances. He is therefore subject to personal liability under 42 U.S.C. § 1983 not only if he directed third parties to deny plaintiff's constitutional rights, but also if he had actual knowledge of or acquiesced in such deprivation. *See Woodward v. City of Worland,* 977 F.2d 1392, 1400 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). Evaluating the evidence in the light most favorable to Jacobsen, Lambers' claim of qualified immunity must fail.

Officer Taylor has likewise failed to establish his entitlement to summary judgment. Individual officials are not personally liable for constitutional deprivations resulting from actions taken in their official capacity so long as their conduct was undertaken in good faith. *Miller v. City of Mission, Kan.,* 705 F.2d 368, 375 (10th Cir.1983). However, such an individual may be liable " 'when the defendant was in a position of responsibility, knew or should have known of the misconduct, and yet failed to act to prevent future harm.' " *Id.* (quotation omitted). Plaintiff has presented unrefuted evidence that officer Taylor was on notice that plaintiff's arrest might violate plaintiff's constitutional rights, yet he failed to alter his course of conduct to prevent such harm from occurring. Under these circumstances, Taylor must come forth with proof that his actions were undertaken in good faith and were thus objectively reasonable. He has not done so. Consequently, the Court cannot determine at this point in the proceedings, as a matter of law, that Taylor's actions are insufficient to establish liability. His request for summary judgment must be denied.

## C. *Liability of Defendants in Their Official Capacity*

Defendants, in a circular and tortured reading of Supreme Court case law, argue that Lambers and Taylor cannot be held liable in their official capacities because plaintiff has not proven that they created the policy or custom behind Ordinance No. 3103–94. In support of their argument, defendants rely heavily on *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In that case, the Court held that while a municipality cannot be held liable under Section 1983 on a respondeat superior theory simply because it *employs* a tortfeasor, such a local government *is* liable for an injury inflicted by its employees' execution of the government's official policies or customs. *Id.* at 690–96, 98 S.Ct. at 2036–38. *Monell* is a case about municipal liability, not about individual liability in defendant's official capacity. As such, it is totally inapposite to defendants' argument.

Defendants' argument runs something like this: since a municipality may be responsible for injuries inflicted pursuant to an official policy, and since defendants did not make the policy at issue here, defendants must not be responsible for their own actions. This is a nonsensical argument, and it most certainly does not state the law in Section 1983 actions. Individual officials may be held liable in their official capacities when, acting under color of state law, their actions cause a deprivation of rights secured by the Constitution and laws of the United States. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Defendants have made no showing that they should not be held liable under this standard. Accordingly, we must deny their motion for summary judgment on this point.

**IT IS THEREFORE ORDERED** that *Defendants' Motion for Summary Judgment* (Doc. # 22), filed April 3, 1995, be and hereby is sustained as to plaintiff's claims of selective enforcement and denial of due process, and that said motion be otherwise overruled.

**IT IS FURTHER ORDERED,** for reasons previously stated, that *Defendant Scott*

*Lambers' Response to the Court's Show Cause Order and Motion To Dismiss Scott Lambers From This Litigation In His Individual Capacity* (Doc. # 18) filed March 22, 1995, be and hereby is overruled.

**IT IS FURTHER ORDERED** that in the event defendants do not timely appeal this order, this matter be and hereby is set for trial on the docket beginning July 5, 1995.

EXHIBIT A

PUBLISHED JUNE 7, 1994

ORDINANCE NO. 3103–94

BILL NO. 94–35

*AN ORDINANCE DEFINING, REGULATING AND LICENSING ITINERANT SALESMAN, MERCHANTS, SOLICITORS, AND VENDORS AND PROVIDING PENALTIES FOR VIOLATIONS THEREOF.*

BE IT ORDAINED by the Governing Body of the City of Ottawa, Kansas, that:

*Section 1.* DEFINITIONS: For the purpose of this chapter, the following words as used herein shall have the following meanings:

a) *Itinerant Solicitors:*

An itinerant solicitor is defined as any individual, whether resident of the City of Ottawa or not, traveling by any means, going door-to-door, house-to-house, or from street to street, taking or attempting to take orders for the sale of goods, wares or merchandise, personal property of any nature whatsoever for future delivery, or for services to be furnished or performed in the future, whether or not such individual has, carries or exposes for sale a sample of the subject of such sale or whether he is collecting advance payments on such sales or not, provided that such definition shall include any person who, for himself, or for another person, firm, or corporation, hires, leases, uses or occupies any building, structure, tent, railroad box car, boat, hotel room, lodging house, motel room, apartment, shop, or any other place within the City for the sole purpose of exhibiting samples and taking orders for future delivery.

b) *Itinerant Merchant or Itinerant Vendor:*

For the purpose of this ordinance an itinerant merchant or itinerant vendor is defined as any person, firm or corporation, whether as owner, agent, consignee or employee, whether a resident of the City or not, who engages in a temporary business of selling and delivering goods, wares and merchandise within said City, and who, in furtherance of such purpose, hires, leases, uses or occupies any building, structure, motor vehicle, tent, motels, lodging houses, apartments, shops, or any street, alley, or other place within the city for the exhibition and sale of such goods, wares and merchandise, either privately or at public auction provided that such definition shall not be construed to include any person, firm, or corporation who, while occupying such temporary location, does not sell from stock, but exhibits samples only for the purpose of securing orders for future delivery only. The person, firm, or corporation so engaged shall not be relieved from complying with the provisions of this ordinance merely by associating temporarily with any local dealer, trader, merchant or auctioneer, or by conducting such transient business in connection with, as part of, or in the name of any local dealer, trader, merchant or auctioneer.

For the purpose of this ordinance the words "itinerant salesman" shall mean any person, firm, or corporation, whether a resident of the City or not, who engages in any manner in selling merchandise of any kind from a wagon, automotive vehicle, or stand temporarily located on the public streets or sidewalks of this City.

c) *Seasonal Itinerant Vendors:*

For the purpose of this ordinance a seasonal itinerant vendor is any person, firm, or corporation, whether as owner, agent, consignee or employee, who uses public rights-of-way to sell ice cream, hot dogs, or similar items.

c) *Premises:*

Premises is defined as any building or property used for residential, commercial, educational, or industrial activity.

d) *Charitable:*

Charitable means and includes patriotic, philanthropic, social service, welfare, benevolent, educational, civic or fraternal, either actual or purported.

e) *Religious:*

Religious means and includes charitable as herein defined, but shall be given its commonly accepted meaning.

f) *Residence:*

Residence shall mean and include every separate living unit occupied for residential purposes by one or more persons, contained within any type of structure.

g) *Person*

Person may be plural or singular and shall mean and include any individual person, firm, or corporation, association, club, partnership, or society, or any other organization, and the agents, servants, or representatives thereof, including religious or charitable organizations.

h) *Licensed Solicitor or Peddler:*

This phrase shall mean and include any person who has obtained a valid permit and license as hereinafter provided, which permit and license is in the possession of the solicitor or peddler on his or her person while engaged in soliciting or peddling.

k) *This section shall not include the following activities:*

(1) Door-to-door, house-to-house, or place-to-place sales, canvassing, or soliciting;

(2) Exhibitions, street fairs, expositions promotional ventures, or entertainment where a special use permit has been obtained, or where such activity is sponsored in part by the City;

(3) Auctions where the items being auctioned are from a permanent business or residence and are being auctioned at that business or residence;

(4) Garage sales;

(5) Sales of agricultural products grown and sold or offered for sale by the individual raising or growing such products.

(6) Sales conducted within the following structures: hotels, motels, trade centers, convention centers, and shopping malls.

(7) After application and approval by the Ottawa City Commission, any activity sponsored or approved by the Ottawa Chamber of Commerce is specifically exempted from this ordinance.

*Section 2.* LICENSE REQUIRED. It shall be unlawful for any person for any agent, servant or employee to engage in, carry on, or conduct the business of an itinerant merchant without first having obtained a license from the City.

Expiration of license; non-transferrable.

a) An itinerant merchant's license shall not exceed a period of fourteen days.

b) A license is not transferrable to any other person, firm, or corporation and cannot be used for any activity or at a location other than those listed on the application and approved for licensing.

*License Application.* A merchant or peddler or seasonal itinerant vendor as defined in this ordinance may obtain a license through the City Clerk's office. A license may be issued only upon the completion of a license application provided by the office of the City Clerk. The application shall require the following information:

a) Name and permanent address of applicant, showing proof of identification;

b) A description of the nature of the business and the items, goods, merchandise, or services being offered;

c) A description of the proposed site, including the dimensions of the area being used, the proximity to buildings, parking lots, rights-of-way or other such areas, and description of any structure, implement, stand, display prop, or other such items used for

the activity including signs, banners or other attention getting devices;

d) A current sales tax license from the State of Kansas or exempt status from state sales tax;

e) The name, address, telephone number, and authorized signature of the owner or manager of the property where the activity is to take place;

f) Identification of zoning classification for the area of the proposed activity as provided by the City Inspector or other authorized City official. Such identification shall not constitute approval of such activity in that zoning classification by the City;

g) Dates and time the activity will be conducted or carried on;

h) Name and permanent address of any agents, employees, partners, companies or organizations being represented in relation to the transient merchant activities;

i) Signature of applicant indicating that all of the information provided is true and correct.

*License Fee:* The license fee for engaging in, carrying on, or conducting business as a merchant or peddler as defined in this ordinance shall be the sum of $25.00 to be paid prior to receiving a license. Payment of the fee shall be by cash or certified check. In the case of seasonal itinerant vendors, the license shall be for ninety (90) days.

Any person engaged in activities as described in the definitions of this ordinance shall exhibit his or her or its license at the request of any citizen or law enforcement officer.

*Section 3.* PENALTIES. Any person, firm or corporation violating any of the provisions of this ordinance shall, upon conviction thereof, be punished by a fine of not less than One Hundred Dollars ($100.00) nor more than Five Hundred Dollars ($500.00) or by imprisonment not to exceed 60 days or both such fine and imprisonment.

*Section 4.* This ordinance shall take effect upon publication in the official City newspaper.

*Section 5.* This is an ordinance of general import and should become part of the Municipal Code of 1982 and hereafter designated as 11–402a.

APPROVED AND PASSED by the Governing Body of the City of Ottawa, Kansas on the 1st day of June, 1994.

/s/ Vicki Cummiskey
Vicki Cummiskey, Mayor

ATTEST:

/s/ Scott D. Bird
Scott Bird, City Clerk